# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
KERN, ALDYKIEWICZ, and MARTIN
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Private E2 STEVEN F. GUZMAN II**
**United States Army, Appellant**

ARMY 20100020

Headquarters, Fort Bliss
Michael Hargis, Military Judge
Colonel Michael J. Benjamin, Staff Judge Advocate (pretrial)
Colonel Francis P. King, Staff Judge Advocate (post-trial)

For Appellant: Colonel Patricia A. Ham, JA; Lieutenant Colonel Imogene M. Jamison, JA; Major Jacob D. Bashore, JA; Captain Stephen J. Rueter, JA (on brief).

For Appellee: Lieutenant Colonel Amber J. Roach, JA; Major Katherine S. Gowell, JA; Captain Daniel D. Maurer, JA (on brief).

20 September 2013

----------------------------------
MEMORANDUM OPINION
----------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

ALDYKIEWICZ, Judge:

A military judge sitting as a general court-martial convicted appellant, pursuant to his pleas, of absence without leave, wrongful use of cocaine, and wrongful possession of cocaine in violation of Articles 86 and 112a, Uniform Code of Military Justice, 10 U.S.C. §§ 886, 912a (2006) [hereinafter UCMJ].  Contrary to his pleas, a panel of officer and enlisted members convicted appellant of attempted rape, assault consummated by a battery upon a child under 16 years of age, and housebreaking in violation of Articles 80, 128, and 130, UCMJ.  The panel sentenced appellant to a dishonorable discharge, confinement for 17 years, forfeiture of all pay and allowances, and reduction to the grade of E-1.  The convening authority approved the sentence as adjudged, crediting appellant with 229 days of confinement.

GUZMAN—20100020

This case is now before us for review pursuant to Article 66, UCMJ. Appellate counsel raises three assignments of error: (1) that the government failed to disclose specifically requested and discoverable evidence under *Brady v. Maryland*, 373 U.S. 83 (1963), Article 46, UCMJ, and Rule for Courts-Martial [hereinafter R.C.M.] 701, in violation of appellant's due process rights; (2) that the evidence is both legally and factually insufficient to sustain appellant's conviction for attempted rape; and (3) the "dilatory post-trial processing of [appellant's] case warrants relief." Appellant also personally raises matters pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). All three issues raised by appellate counsel warrant discussion but no relief.[1]

**FACTS**

*BACKGROUND – GENERALLY*

On 29 October 2008, just outside of Fort Bliss, Texas, appellant purchased cocaine from an unnamed individual. He then inhaled (snorted) the cocaine through his nose after placing it on a compact disc (CD) case that he had in his vehicle. This 2008 cocaine use formed the factual basis for the first of appellant's two Article 112a, UCMJ offenses to which he pleaded guilty (wrongful use of cocaine). The factual basis for the remaining guilty plea offenses, violations of Article 86 and 112a, UCMJ (i.e., absence without leave (AWOL) terminated by apprehension and wrongful possession of cocaine respectively) are addressed below.

On 27 May 2009 appellant resided on Fort Bliss. Around 1800 hours, appellant went to the off-post residence of Mr. MC [hereinafter MC], a friend and admitted drug dealer, where appellant and MC proceeded to use cocaine. As he had done seven months earlier, appellant snorted his cocaine while MC smoked his. After using approximately "two lines" of cocaine each, appellant and MC departed MC's residence in appellant's truck to "reload" (i.e., resupply) during which time MC purchased an "eight ball," approximately seven grams of cocaine. After reloading, appellant and MC returned to MC's residence where MC weighed the cocaine and provided appellant with a plastic baggie containing an estimated 5 grams or $250.00 worth of cocaine, the majority of which appellant and MC used

---

[1] Among those issues personally raised by appellant pursuant to *Grostefon* is a challenge to the sufficiency of the evidence in support of his conviction for attempted rape, a matter specifically raised by appellate counsel. To the extent that appellant's *Grostefon* issues overlap with appellate counsel's three assignments of error, they are addressed and resolved by this court's opinion. To the extent appellant personally raises matters not addressed by appellate counsel's assignments of error, those matters have been considered, are without merit, and warrant no relief.

between 2100 hours, 27 May 2009 and 0300 hours, 28 May 2009. MC estimated that during that six hour period following the reload, he and appellant used cocaine every 20-30 minutes. Appellant himself corroborated MC's estimation when appellant, testifying on the merits, estimated that he did approximately 15 to 21 lines of cocaine, his last use occurring within 30 minutes of his 0300 hours, 28 May 2009 departure from MC's residence to return to Fort Bliss. Appellant testified that each line of cocaine represented an estimated .25 to .50 grams.

As appellant departed MC's residence to return to Fort Bliss, he took with him the now near empty baggie of cocaine. According to appellant all that remained in the baggie was "cocaine residue," a quantity appellant described as insufficient to be useable. The cocaine within this baggie formed the factual basis for appellant's second Article 112a, UCMJ guilty plea offense (i.e., wrongful possession of cocaine).

At approximately 0545 hours, 28 May 2009, Ms. DR, the civilian spouse of Private First Class (PFC) GR, awoke as her husband prepared to depart their on-post duplex to begin his duty day. As PFC GR departed, DR fell back asleep. Ms. DR customarily slept in shorts only, sleeping naked from the waist up with the bed covers pulled all the way up for warmth; the morning of 28 May 2009 was no different. That morning DR slept in pink shorts and no shirt, covered by the bedding.

At approximately 0600 hours, DR was awakened to the pain of being hit on the temple beside her left eye and finding a man on top of her. Her assailant was wearing black pants, a black shirt, and a "toboggan or beanie like a winter cap" which fully covered his face and head initially concealing her attacker's identity. DR screamed and fought back. However, her attacker continued to hit her in the face and jaw. He also grabbed her jaw, head, and neck, attempting to turn her over, attempts that, because of DR's active resistance, proved ineffectual despite his continued efforts. The bedding that covered DR's partially naked body when she had fallen back asleep was gone, ostensibly removed by appellant prior to him getting into bed with and climbing on top of DR.

Throughout DR's struggle with appellant, appellant remained on top of her, straddling her body with his hips and he repeatedly struck her in the head and face with his fists. Appellant used his legs to restrain DR's legs, placing his legs on the outside of DR's legs to limit her movement. At one point, appellant raised his hips and shifted his weight forward, driving DR's shoulder into the bed. During this interchange, appellant's chest made contact with appellant's bare breasts. At no time, however, did appellant grope or reach for DR's bare breasts. After making contact with her naked chest, the struggle continued with appellant again using his body weight to pin DR to the bed. Appellant shifted his weight from his lower body forward for a second time, again raising his hips off of DR's body. This time

3

appellant's hand was on DR's naked stomach, a hand appellant moved towards DR's crotch, moving it from above to below her navel. Appellant's hand movement ceased just below DR's navel, however, because DR was able to free her legs which she used to kick appellant in the back. DR specifically recalls feeling the back of appellant's hand making contact with her naked stomach and moving down toward her crotch.

As DR continued to fight off her attacker, an attacker she had yet to identify, she made contact with the cap concealing his face and head, partially exposing her attacker's head. Capitalizing on the moment, she was able to fully remove the cap and expose her yet unidentified attacker. Once removed, she immediately recognized her attacker as appellant, the soldier who lived in the residence diagonally across the street from her. Upon recognizing him, DR yelled his name, at which time appellant jumped off of DR and fled from the residence to his home across the street. DR likewise fled the residence, running to the adjacent duplex for help. As she fled her own residence in search for help, DR saw appellant run into his home.

Within minutes of the initial attack, at approximately 0610 hours, DR made contact with her neighbor, Specialist (SPC) WC, a medic who described DR as "fairly frantic" and "obviously in distress." As DR tried to tell SPC WC about the attack in her home, she observed appellant, wearing only jeans and no shirt, get into his truck and flee the area. DR's account of appellant's flight from the area was confirmed by SPC WC, who, while trying to calm DR and determine what happened to her, heard tires squeal. As he looked up, SPC WC observed a shirtless appellant in his truck fleeing the area. Within minutes, SPC WC notified law enforcement about the attack on DR. DR was transported to the local hospital and agents from the Fort Bliss Criminal Investigation Command (CID) processed her on-post residence as a crime scene. CID seized, among other items, the bedding from her bedroom (i.e., two comforters and a blanket) and a rubber glove found adjacent to DR's bed. As part of the investigation, CID also later seized the pink shorts DR was wearing when attacked.

At approximately 0700 hours, 28 May 2009, appellant, having fled Fort Bliss, returned to MC's residence where Ms. TC, MC's self-proclaimed "common law" wife, asked appellant to drive her 13-year-old daughter, Ms. DC to school. Appellant agreed and sometime between 0715 hours and 0720 hours, appellant and DC left in appellant's truck en route to DC's school. Unfamiliar with the route, DC provided appellant with directions, telling appellant when and where to turn. Shortly before arriving at her school, however, appellant stopped at a nearby 7-Eleven convenience store to fill up his truck with gas. Behind the 7-Eleven was an alley. After filling up his truck, appellant proceeded towards DC's school. Rather than stop at her school, however, appellant drove past DC's school. After turning the vehicle around, in an apparent attempt to return to the school, appellant again

4

drove past DC's school, this time driving to the alley behind the 7-Eleven. Once in the alley, appellant turned off his truck, unbuckled his seat belt, and, without saying a word, proceeded to place his right hand around DC's neck and began to choke her. After a brief struggle, DC broke appellant's grip, opened the passenger side door of appellant's truck, and ran to her school where she initially made contact with her art teacher, Mr. O. Mr. O took a crying and obviously distraught DC to the assistant principal's office. El Paso law enforcement was notified and, after Ms. HS, the school nurse, examined DC, DC was taken home and subsequently interviewed by members of the El Paso Police Department.

That same day, after appellant's attack on DC, he fled the area in his truck en route to North Carolina. At approximately 0836 hours, as appellant was fleeing the El Paso area, appellant called Staff Sergeant (SSG) SW, his squad leader, and, without prompting or explanation, told SSG SW, "I fucked up."

Two days later, on 30 May 2009, appellant was apprehended in North Carolina and detained pending extradition to El Paso, Texas on charges stemming from his attack on DC. Appellant's absence from his unit beginning on 28 May 2009 until it was terminated by apprehension on 30 May 2009 formed the factual basis for appellant's guilty plea to the Article 86, UCMJ violation (i.e., AWOL terminated by apprehension), the third of three offenses to which appellant pleaded guilty.

### PRETRIAL ARTICLE 32, UCMJ INVESTIGATION, REQUEST FOR PRETRIAL DEPOSITION, AND PRETRIAL DISCOVERY

On 24 August 2009, the Article 32, UCMJ investigation into appellant's charges and specifications was held. Both DR and DC were declared unavailable, however, DR testified telephonically; DC did not provide any testimony.

On 31 August 2009, the Investigating Officer completed his Article 32, UCMJ report. Among the enclosures to the Investigating Officer's Report was "Exhibit 20: EPPD [El Paso Police Department] Incident/Investigation Report for crime committed against Miss [DC], dated 28 May 2009." Within Exhibit 20 are two references to pictures taken of DC close in time to appellant's attack. The pictures themselves are not part of the Article 32, UCMJ report and there is no evidence any pictures were ever considered by the Article 32 Investigating Officer.

On 25 September 2009, appellant's trial defense counsel submitted a written request, thru the trial counsel and staff judge advocate, to the General Court-Martial Convening Authority (GCMCA) asking, in part, that: the Article 32 Investigating Officer be appointed as a deposition officer to depose DC; and, the Investigating Officer "ensure the government obtain subpoena (sic) for Ms. [C's] school records, social work service records, and photographs of Ms. [C] on or about 28 May 2009."

On 18 November 2009, the GCMCA acted on the 25 September 2009 request, denying the requested deposition of DC and noting that "[a]ll discoverable records and evidence, including a videotaped interview, pertaining to Ms. [C] are available to the defense under the provisions of Article 46, Uniform Code of Military Justice and Rule for Court-Martial 701."

As noted in the government's pleadings before this court, "the record in this case does not include a direct discovery request from the defense asking for the photographs at issue, nor does the record include a motion to compel such production." However, the government, in its pleadings before this court, concedes the trial defense counsel's memorandum constitutes a specific request for the pictures at issue, a concession we accept for purposes of this decision.

*PRETRIAL ARTICLE 39(a) SESSIONS AND APPELLANT'S GUILTY PLEA*

On 24 November 2009, appellant was arraigned on the charges at issue. Article 39(a), UCMJ sessions were held on 24 November 2009, 11 December 2009, 28 December 2009, and 11 January 2010. The guilty plea portion of appellant's trial, voir dire, and assembly of the court occurred on 11 January 2010 and the remainder of the trial through sentencing occurred from 11 January 2010 through 14 January 2010.

On 4 December 2009, trial defense counsel brought a motion to compel DC's deposition. Within the defense's motion was an acknowledgement that the defense received the El Paso Police Report, a fact confirmed in the government's 10 December 2009 response to the motion to compel deposition.[2] At no time during the pendency of appellant's court-martial or during the proceedings themselves did trial defense counsel bring a motion to compel access to or production of any photographs relating to DC.

As noted above, on 11 January 2010, the pretrial phase of appellant's court-martial ended and appellant entered a mixed plea, pleading guilty to one violation of Article 86, UCMJ (i.e., absence without leave terminated by apprehension) and two violations of Article 112a, UCMJ (i.e., wrongful use of cocaine and wrongful possession of cocaine). Appellant pleaded not guilty to the remaining specifications and elected trial before an officer and enlisted panel.

---

[2] The motion to compel DC's deposition was litigated during the 11 December 2009 Article 39(a), UCMJ session of the court and resolved by the parties without formal ruling by the military judge.

*TRIAL ON THE CONTESTED OFFENSE(S) – GOVERNMENT MERITS CASE*

In its case-in-chief, both victims, DR and DC, positively and without equivocation, identified appellant as their attacker, each testifying consistent with the facts as noted in the above background section.[3] Most notable of the thirteen additional merits witnesses called by the government were the following: (1) SPC WC, who identified appellant, shirtless, as he fled the housing area immediately following the attack on DR, corroborating DR's identification and observations; (2) Ms. MLH, an expert in trace evidence who testified that the pink fibers found on sweat pants seized from appellant's home "were consistent or the same in all the characteristics [she] could [scientifically] examine with the fibers of the pink shorts" DR was wearing the morning of the attack; (3) Mr. MT, a DNA expert, who testified that appellant was a possible contributor of the mixed profile DNA evidence found "on the inside of the glove" seized from DR's bedroom, and, after factoring in the Earth's population of 9 billion people and the statistical probability of randomly finding the DNA profile found in the glove among Hispanics at "one in four point two quadrillion," he "would not expect to find this DNA profile anywhere else in the population on earth;" and, (4) SSG SW, appellant's squad leader, who testified that within hours of attacking DR and DC, appellant called him and, without prompting or explanation, stated, "I fucked up."

Additionally, the government introduced, among other items, Prosecution Exhibits 15 and 20, the "Trace Evidence Branch – Final Report," dated 26 June 2009 and the "DNA Branch – Final Report," dated 7 August 2009, both of which were consistent with the testimony provided by Ms. MLH and Mr. MT respectively,

*TRIAL ON THE CONTESTED OFFENSE(S) – DEFENSE MERITS CASE*

The defense's case began with the appellant taking the stand. The central theme of the defense's case was two-fold: (1) DR was mistaken in identifying appellant as her attacker in that appellant was never in her home; and, (2) appellant simply drove DC to school without ever assaulting her or taking her to any alley. Of note, during his direct testimony, appellant admitted to "using illicit drugs" with MC on 27 May 2009 as well as deciding, on 28 May 2009, to leave Texas and go AWOL. Appellant testified that he was not in DR's home the morning of 28 May 2009. When asked about the glove with "his DNA," he testified that he used gloves to paint his vehicle and when done painting, he discarded the used gloves in the "trash recycle beside [his] house." In an attempt to discredit DC, appellant testified that his removal of the passenger's interior door panel to his truck caused the passenger

---

[3] The government called a total of 15 merits witnesses in its case-in-chief. The defense called seven witnesses, which included appellant, on the merits. The government called one rebuttal witness.

door handle inside the vehicle to become inoperable, requiring him to open the door from the outside by using his ignition key "to unlock the door."

Appellant's direct testimony concluded with appellant attempting to explain his spontaneous and unsolicited statement to his squad leader. The following colloquy between appellant's trial defense counsel and appellant transpired:

> Q. Also Private Guzman, I know that there were text messages; I know there were phones going back and forth. When Sergeant (sic) [W], who's given testimony today, he said you said the "F" word, "I messed up." What were you referring to?
>
> A. I was talking about going AWOL, sir.
>
> Q. And it wasn't because you assaulted somebody?
>
> A. No, sir.
>
> Q. And it wasn't because you tried to rape anyone?
>
> A. No, sir.
>
> Q. And it wasn't because you tried to break into somebody's house?
>
> A. No, sir.
>
> Q. Private Guzman, on the day in question, 28 May 2009, did you assault [DR]?
>
> A. No, sir, I did not.
>
> Q. Also Private Guzman, did you break into the [R's] house?
>
> A. No, sir, I did not.
>
> Q. Did you assault [DC] on that day?
>
> A. No, sir, I did not.

Earlier in his direct examination appellant denied ever being in DR's home while the [R's] were home and denied being in the home on 28 May 2009.

8

Of the remaining six defense witnesses, only HS is relevant to those issues identified at the outset of this opinion as worthy of discussion, specifically the discovery-related assignment of error and the government's alleged failure to turn over pictures relating to DC shortly after she was attacked. As previously noted, HS was the school nurse who examined DC within minutes of appellant's attack. Ms. HS testified that she examined DC "before eight-thirty AM," and that she examined "her face, her neck, her chest, her back, her abdomen, her arms and her hands." Ms. HS's examination of DC within an hour of appellant's attack failed to reveal any signs of injury, not even any redness.

*TRIAL ON THE CONTESTED OFFENSE(S) – GOVERNMENT REBUTTAL CASE*

In rebuttal, the government called only one witness, MC, who testified that, other than a missing door panel, the passenger door to appellant's truck was fully functional and could be opened from both the inside and outside of the vehicle with the door handle and without assistance from appellant. MC testified that he himself opened the passenger door of the truck using the interior door handle when he was a passenger in appellant's vehicle fewer than 24-hours prior to the assault upon DC, apparently referring to the time he drove in appellant's car to "reload" on cocaine.

*CLOSING ARGUMENTS*

The government's primary argument on findings spanned nine pages of the 932-page record and was approximately 1940 words in length. At no time during the government's main argument did trial defense counsel object, nor was there any interruption by the military judge. The defense's closing argument covered 29 pages of the record and was approximately 6780 words in length, an argument interrupted three times by government objection as well as three additional times by the military judge for a matter unrelated to the government's objection. The military judge's sua sponte interruptions of trial defense counsel's argument was to advise trial defense counsel of both the irrelevance and impropriety of stating trial defense counsel's personal views, thoughts, or opinions during closing argument. The government's rebuttal argument spanned eight pages, consisted of approximately 1965 words, and was, like their main argument, made without objection by trial defense counsel or interruption by the military judge.

Although improper argument by the trial counsel is not raised as a separate assignment of error, the government's rebuttal argument is raised by appellate counsel in the pleadings before this court in support of their legal and factual sufficiency assignment of error challenging appellant's attempted rape conviction. At issue are eight words used by government at the close of the rebuttal argument. The government argued, in part: "[h]e lifted up his hand and reached his hand down. *Pulled out his penis; pulled her shorts down.* This act was going to happen." The italicized language, argued as error on appeal, was neither objected to nor resulted in

any curative instruction by the military judge, either in response to a defense request for such an instruction or sua sponte. All parties agree and a review of the record reveals no evidence at the court-martial that DR's attacker either pulled out his penis or pulled down her [DR's] shorts during the 28 May 2009 attack.[4]

### POST-TRIAL EVIDENTIARY DEVELOPMENTS

On 17 November 2011, this court granted defense appellate counsel's motion to attach Defense Appellate Exhibit A (DAE A) and Defense Appellate Exhibit B (DAE B), the former an affidavit from appellant's trial defense counsel and the latter a CD with seven digital images [hereinafter pictures], five allegedly of DC shortly after appellant's attack and two of El Paso Police Department "Call Cards." The trial defense counsel's affidavit states, in part:

> 2. Before the Court Martial (sic) in January 2010, I requested discovery from the Government's Counsel. Specifically, I requested copies of pictures that had been taken of [DC] by the El Paso Police Department regarding the alleged assault charge via email. There were no pictures produced by the Government and no Government attorney, to my knowledge, was in possession of the pictures; however, the El Paso Police Report stated pictures were taken in the El Paso Police Report.

> 3. So after requesting copies of the pictures from the Government's Counsel and not receiving any pictures, I left the pictures issue alone until after the Court Martial (sic). However, after the Court Martial, I requested copies of the pictures via FOIA from the El Paso Police Department in El Paso, Texas.

> 4. When I received the pictures from the El Paso Police Department in 2011, I forwarded the pictures to the Defense Appellate Division Attorney CPT [SR].

---

[4] DR testified and the parties agree that DR's attacker never groped or fondled her bare breasts, despite making chest to chest contact during the atttack. DR further testified, on cross-examination by trial defense counsel, that she was never "penetrated" and that "during the scuffle" her attacker did not try to penetrate her. Penetration, however, was never defined.

> 5.  I have no knowledge of the Government's attorney
> holding onto pictures and not disclosing.  It is my belief
> that the El Paso Police Department was slow in processing
> the pictures.

With the exception of one picture found on DAE B, none of the pictures are date/time stamped.  The one picture that is date/time stamped bears the date/time stamp of "05/27/2009 14:34," a date/time stamp approximately 17 ½ hours prior to the assault at issue.  This picture ostensibly[5] reveals DC at her middle school as evidenced by the notes on the bulletin board behind DC and over her left shoulder.  The remaining four pictures depicting a young female are ostensibly[6] DC in a room at the El Paso Police Department.  None of the five pictures reveal any injury or redness to either DC's neck or the surrounding facial area, although the date/time stamped picture reveals redness in the subject's eyes, redness not inconsistent with someone who has recently been crying.[7]

## POST-TRIAL PROCESSING

A summary of the post-trial processing of appellant's case follows below with a more detailed chronology in the appendix to this opinion.

- 14 January 2010  –  trial ends;
- 7 December 2010  –  initial action taken;
- 14 December 2010 –  record of trial received by this court;
- 9 November 2011  –  brief on behalf of appellant filed;
- 6 June 2012  –  brief on behalf of appellee filed;
- 12 June 2012  –  reply brief on behalf of appellant filed;
- 13 May 2013  –  1st motion for expedited review filed;

---

[5] "Ostensibly" is used because DAE B lacks any accompanying documentation providing information about the photographs contained therein such as who took them, when they were taken, or under what factual scenario or circumstances they were taken.  In other words, the photographs lack, beyond the accompanying affidavit from the trial defense counsel (DAE A), any traditional foundation documents (*see* Military Rule of Evidence [hereinafter Mil. R. Evid.] 901) normally associated with photographs to establish relevance under Mil. R. Evid. 401.

[6] *See* footnote 5 supra.

[7] For purposes of this appeal, we shall treat the pictures as being that of DC following the incident since their authenticity as well as the trial defense counsel's affidavit is unchallenged by the government in its pleadings before this court.

- 22 July 2013     –   supplemental assignment of error filed;
- 23 July 2013     –   2d motion for expedited review filed; and
- 2 August 2013     –   supplemental appellee brief filed.

## LAW AND DISCUSSION

### *ALLEGED DISCOVERY VIOLATION*

We first address appellant's assignment of error alleging a failure on the government's part to disclose "evidence prior to trial which was specifically requested and discoverable under *Brady v. Maryland*, 373 U.S. 83 (1963), Article 46, UCMJ, and Rule for Courts-Martial 701, thereby violating appellant's due process rights."

"Where an appellant demonstrates that the Government failed to disclose discoverable evidence in response to a specific request or as a result of prosecutorial misconduct, the appellant will be entitled to relief unless the Government can show that nondisclosure was harmless beyond a reasonable doubt." *United States v. Roberts,* 59 M.J. 323, 327 (C.A.A.F. 2004) (citing *United States v. Hart,* 29 M.J. 407, 410 (C.M.A. 1990)). "Failing to disclose requested material favorable to the defense is not harmless beyond a reasonable doubt if the undisclosed evidence might have affected the outcome of the trial." *United States v. Coleman*, 72 M.J. 184, 187 (C.A.A.F. 2013). "The review of discovery violations involves case-specific considerations." *United States v. Santos,* 59 M.J. 317, 322 (C.A.A.F. 2004). "'[A]n appellate court may resolve a discovery issue without determining whether there has been a discovery violation if the court concludes that the alleged error would not have been prejudicial." *United States v. Luke*, 69 M.J. 309, 320 (C.A.A.F. 2011) (quoting *Santos,* 59 M.J. at 321).

Article 46, UCMJ provides:

> The trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe. Process issued in court-martial cases to compel witnesses to appear and testify and to compel the production of other evidence shall be similar to that which courts of the United States having criminal jurisdiction may lawfully issue and shall run to any part of the United States, or the Commonwealths and possessions.

Rule for Courts–Martial 701(a)(2) provides:

After service of charges, upon request of the defense, the Government shall permit the defense to inspect:

(A) Any books, papers, documents, photographs, tangible objects, buildings, or places, or copies of portions thereof, which are *within the possession, custody, or control of military authorities*, and which are material to the preparation of the defense or are intended for use by the trial counsel as evidence in the prosecution case-in-chief at trial, or were obtained from or belong to the accused; and

(B) Any results or reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are *within the possession, custody, or control of military authorities*, the existence of which is known or by the exercise of due diligence may become known to the trial counsel, and which are material to the preparation of the defense or are intended for use by the trial counsel as evidence in the prosecution case-in-chief at trial.

(emphasis added).  R.C.M. 701(a)(6) states:

*Evidence favorable to the defense*.  The trial counsel shall, as soon as practicable, disclose to the defense the existence of evidence known to the trial counsel which reasonably tends to:

(A) Negate the guilt of the accused of an offense charged;

(B) Reduce the degree of guilt of the accused of an offense charged; or

(C) Reduce the punishment.

 (emphasis added).

A review of appellant's trial defense counsel's affidavit, DAE A, reveals several facts relevant to the alleged nondisclosure by the government, facts undisputed in the record.  First, the CD containing the pictures at issue was apparently not in the possession of the government; rather, the undisputed evidence of record is that the pictures were maintained by civilian law enforcement authorities, to wit, the El Paso Police Department, until provided to the trial defense

counsel in response to a post-trial Freedom of Information Act request. Second, trial defense counsel was aware of the pictures' existence prior to trial, as evidenced not only by DAE A but also by the trial defense counsel's 25 September 2009 memorandum to the convening authority requesting, in part, that the Article 32 Investigating Officer "ensure the government obtain subpoena (sic) for Ms. [C's] school records, social work service records, and photographs of Ms. [C] on or about 28 May 2009." Third, the nature of the pictures at issue, that is, whether favorable to the defense or not, was not readily apparent to the government.

On 18 November 2009, the convening authority responded to the trial defense counsel's request, noting that "[a]ll discoverable records and evidence, including a videotaped interview, pertaining to Ms. [C] are available to the defense under the provisions of Article 46, Uniform Code of Military Justice and Rule for Court-Martial 701." By its plain language, defense was referred back to Article 46, UCMJ, and R.C.M. 701, the former providing defense with equal access to evidence and the latter requiring the government turn over evidence "within the possession, custody, or control of military authorities." Nothing in the 18 November 2009 response memorandum establishes either "possession, custody, or control" of the pictures at issue by military authorities or whether the pictures are "favorable to the defense."

Having not received any pictures, the trial defense counsel in his affidavit notes that he "left the pictures issue alone until after the Court Martial (sic). However, after the Court Martial (sic), [he] requested copies of the pictures via FOIA from the El Paso Police Department in El Paso, Texas." The trial defense counsel's affidavit concludes with the following: "I have no knowledge of the Government's attorney holding onto pictures and not disclosing. It is my belief that the El Paso Police Department was slow in processing the pictures."

The evidence of record fails to establish that the pictures contained on DAE B were "within the possession, custody, or control of military authorities" triggering the government's obligation to disclose pursuant to R.C.M. 701(a)(2).[8] The record also fails to establish whether the pictures, whose existence was apparently known to

---

[8] That the pictures at issue were not within the government's "possession, custody, or control" is necessarily established by the trial defense counsel's 25 September 2009 memorandum seeking a subpoena for, *inter alia*, the pictures as the government has no need to subpoena that which is already within its possession or control. "R.C.M. 703(f)(4)(B) provides for the subpoena of evidence not under control of the Government." *United States v. Reece*, 25 M.J. 93, 94-95 (C.M.A. 1987); *see United States v. Rodriguez*, 57 M.J. 765, 770 (Navy-Marine Ct. Crim. App. 2002) ("The Government may obtain by subpoena evidence that is not under its control. R.C.M. 703(f)(4)(B)"); *United States v. Pinson*, 54 M.J. 692, 699 (Air Force Ct. Crim. App. 2001).

all parties at the time of the Article 32 investigation, was evidence known to the trial counsel reasonably tending to negate appellant's guilt, reduce the degree of guilt, or reduce any punishment that might be adjudged if found guilty. In other words, the record is silent regarding the government's awareness of any evidence favorable to the defense and thus discoverable under R.C.M. 701(a)(6). Furthermore, nothing in the record establishes trial defense counsel was denied access to the pictures by the civilian agency. To the contrary, once a FOIA request was submitted, trial defense counsel received the pictures.

Assuming without deciding that the evidence was within the government's control, exculpatory under *Brady*, and "located within the parameters of files that the prosecution must review for exculpatory material," *United States v. Williams*, 50 M.J. 436, 440 (C.A.A.F. 1999), we find, under the facts of this case, appellant waived any objection to nondisclosure of the evidence. *See United States v. Avery*, 52 M.J. 496, 499 (C.A.A.F. 2000) (finding waiver by defense upon discovery of prior rape allegation by victim against another Soldier after trial commenced yet failing to request a continuance, make a motion to compel, and indicating an intent not to go into the prior rape allegation). Trial defense counsel's post-trial affidavit, DAE A, indicates a conscious decision by counsel to forego production of pictures, pictures that he knew were in existence prior to trial. Rather than seek a continuance or motion to compel, trial defense counsel chose to leave the pictures issue "alone until after the Court Martial (sic)." Assuming waiver does not apply, we find no error on the part of the military judge, plain or otherwise with regard to non-production of the pictures in question, pictures the existence of which the military judge was never independently aware or made aware of by the trial defense counsel who knew of their existence and location.

Finally, we find nondisclosure under the facts of this case to be harmless beyond a reasonable doubt, entitling appellant to no relief. S*ee Santos,* 59 M.J. at 321. The pictures at issue are, or purport to be, images of DC following appellant's attack. They show DC's face and neck without any signs of visible injury. This exact information, however, was already before the trier of fact in the form of live testimony from both DC, appellant's accuser, and a defense witness, HS, the school nurse who examined DC within an hour of the attack. DC confirmed, on cross-examination, that appellant's attack left no marks. Similarly, HS testified her examination of DC's face, neck, chest, back, abdomen, arms, and hands all failed to reveal any signs of injury, not even any redness. The pictures simply corroborated the un-rebutted testimony of both appellant's accuser, DC, and the school nurse, HS, the latter being a neutral fact witness without any personal relationship to either DC or appellant. The pictures were "cumulative" with that evidence already admitted, evidence that was not in dispute, and any additional value they may have provided was "minimal." *Santos*, 59 M.J. at 322.

*LEGAL AND FACTUAL SUFFICIENCY OF APPELLANT'S ATTEMPTED RAPE
CONVICTION (PRE-CLOSING ARGUMENT)*

We next turn to the legal and factual sufficiency of appellant's conviction for attempted rape in violation of Article 80, UCMJ. The focal point of appellant's argument is that the evidence is insufficient to establish, beyond a reasonable doubt, the specific intent to commit rape necessary to sustain an attempted rape conviction. Of note, the government, in its pleadings before this court, agrees with appellant, conceding that the evidence "is insufficient to prove that appellant had the requisite intent to penetrate DR's vagina while she was incapable of resisting his force" and urges this court to "affirm a conviction for aggravated assault (assault with a force likely to produce death or grievous bodily harm) as an LIO [lesser included offense] of attempted rape."[9] Our review of the record, however, reveals sufficient evidence, both legally and factually, to sustain appellant's conviction for attempted rape. Therefore, we decline to accept the government's concession.

Article 66(c), UCMJ, provides that a Court of Criminal Appeals "may affirm only such findings of guilty . . . as it finds correct in law and fact." In performing our duty, we must conduct a de novo review of legal and factual sufficiency. *United States v. Gilchrist,* 61 M.J. 785, 793 (Army. Ct. Crim. App. 2005) (citing *United States v. Washington,* 57 M.J. 394, 399 (C.A.A.F. 2002)). The test for legal sufficiency is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Lubasky,* 68 M.J. 260, 263 (C.A.A.F. 2010) (citations omitted). The test for factual sufficiency is "whether, after weighing the evidence of record and making allowances for not having personally observed the witnesses, [this court is] convinced of appellant's guilt beyond a reasonable doubt." *Gilchrist,* 61 M.J. at 793 (citing *United States v. Turner,* 25 M.J. 324, 325 (C.M.A. 1987)). This review for factual sufficiency "involves a fresh, impartial look at the evidence, giving no deference to the decision of the trial court on factual sufficiency beyond the admonition in Article 66(c), UCMJ, to take into account the fact that the trial court saw and heard the witnesses." *Washington,* 57 M.J. at 399. "[T]o sustain appellant's conviction, we must find that the government has proven all essential elements and, taken together as a whole, the parcels of proof credibly and coherently demonstrate that appellant is guilty beyond a reasonable doubt." *Gilchrist,* 61 M.J. at 793 (citing *United States v. Roukis,* 60 M.J. 925, 930 (Army Ct. Crim. App. 2005)).

---

[9] The government's concession before this court fails to expressly articulate whether the government is conceding based on legal insufficiency, factual insufficiency, or both. The government's brief, however, leads to the conclusion that the concession is one based on factual insufficiency.

The charge of attempted rape in violation of Article 80, UCMJ required the government to prove: (1) that, at or near Fort Bliss, Texas, on or about 28 May 2009, appellant did certain overt acts, to wit: punch DR in the face and body and physically restrain her; (2) that the acts were done with the specific intent to commit the offense of rape; (3) that the acts amounted to more than mere preparation; and (4) that the act apparently tended to effect the commission of the intended offense. *Manual for Courts-Martial*, *United States* (2008 ed.) [hereinafter *M.C.M.*], pt. IV, ¶4.b. That the offense of rape actually occurred or was completed is not required. However, the government must prove that, at the time of the overt acts, appellant intended every element of the offense of rape. The elements of rape (by force) are: (1) that, at or near Fort Bliss, Texas, on or about 28 May 2009, the appellant caused DR to engage in a sexual act; and (2) that appellant did so by using force against DR, to wit: punching DR in the face and body and physically restraining her. *M.C.M.*, pt. IV, ¶45.b.(1)(a)(i).

Drawing "every reasonable inference from the evidence of record in favor of the prosecution," *United States v. Blocker,* 32 M.J. 281, 284 (C.M.A. 1991), we find the evidence of attempted rape legally sufficient. *See e.g.*, *United States v. Graves*, 47 M.J. 632 (Army Ct. Crim. App. 1997) (brutal assault upon victim and attempt to drag her into room where attacker prepared prussic handcuff knots strategically placed on the bed to render victim immobile and in a spread eagle position legally sufficient to sustain conviction); *see also State v. Jackson*, 62 Wash. App. 53 (Wash. Ct. App. 1991) (appellant convicted of attempted rape where he never touched the intended victim nor stated he intended to engage in sexual intercourse; "[t]he evidence relevant to Jackson's intent and his taking a substantial step is that Jackson convinced Z to go into the bedroom, followed her into that room, and then approached her and ordered her to lift her skirt. From this evidence, a jury could reasonably have found beyond a reasonable doubt that Jackson intended to have sexual intercourse with Z, and that he took a substantial step towards that goal.") (footnote omitted); *State v. Arnold*, 1 Kan. App. 2d 642 (Kan. Ct. App. 1977), *rev'd on other grounds* 576 P.2d 651 (Kan. 1978) (evidence sufficient to sustain attempted rape conviction where appellant knocked victim to the ground, had one hand on her neck and mouth, told victim to be quiet or he would kill her, and attempted to turn victim over from her curled position on the ground to her back; appellant left when victim commanded him to leave "in the name of Jesus").

As was the court in *Graves*, we too "are satisfied that the members of the panel, who weighed this evidence using their common sense and knowledge of human nature and the ways of the world, reasonably found beyond a reasonable doubt all of the essential elements of proof, including specific intent, for attempted rape."

Turning to factual sufficiency, appellant relies primarily on *United States v. Polk*, 48 C.M.R. 993 (A.F.C.M.R. 1974). Appellant, in his brief, reads *Polk* too

broadly. *Polk* was decided on a failure of proof regarding the element of "without [the victim's ] consent" and does not, contrary to the assertions in appellant's brief, speak to the degree of force or actions necessary to sufficiently establish an accused's intentions to engage in sexual intercourse or, in appellant's case, a sexual act.

*Polk* is a 1973 attempted rape prosecution applying the elements of Article 120 of the UCMJ as found in the Manual for Courts-Martial, 1969 (Revised ed.). *Polk*, 48 C.M.R. at 996. Attempted rape in *Polk* required "that the accused intended to have sexual intercourse with the victim by force and *without her consent.*" *Polk*, 48 C.M.R. at 997 (emphasis added). Sexual intercourse required penile penetration of "the woman." The specific intent required for attempted rape under the 1969 Manual for Courts-Martial was "'a specific intent to have sexual intercourse with a woman not his wife by force and without her consent. The accused must have intended to overcome any resistance by force, actual or constructive, and to penetrate the woman's person. Any lesser intent will not suffice.'" *Id.* The quoted language from *Polk* and relied upon by appellant in his pleadings before this court is taken from paragraph 213f.(1)(c) of the 1969 Manual for Courts-Martial discussion regarding "*Assault with intent to commit rape.*" This same paragraph, however, goes on to state:

> Indecent advances and importunities, however earnest, not accompanied by such an intent, do not constitute this offense, nor do mere preparations to rape not amounting to an assault. Thus, if a man, intending to rape a woman, conceals himself in her room to await a favorable opportunity to execute his design, but before the opportunity arises is discovered and flees, he is not guilty of an assault with intent to commit rape.
>
> *No actual touching is necessary. If a man enters a woman's room and gets in the bed where she is for the purpose of raping her, he commits the offense under discussion although he does not touch the woman.*

*Id.* (emphasis added).

In *Polk*, the accused: unlawfully entered a dwelling; removed his clothes; entered the victim's bed; "grabbed the victim by her throat and jaws with both hands;" restricted the victim's movements by pressing down on her body with his chest; prevented the victim from moving the accused's hands away from her neck; and then talked to the victim, stating in part that "'[he] had never had a white woman before" and if she would let him have her, he would go away. *Polk*, 48 C.M.R. at 995. While the accused and victim in *Polk* continued to talk, the accused never removed his hand from the victim's throat. The accused also: never

attempted to fondle the victim; never attempted to kiss the victim; and never struck the victim or attempted to injure her "in any way."  *Polk*, 48 C.M.R. at 995.

Before finding the evidence factually insufficient to support an attempted rape conviction, the *Polk* court noted:

> The intention of the accused in the case must be inferred from all of the circumstantial evidence surrounding the offenses, that is, from the acts done and the things said at the time. *No pretrial statement or testimony of the accused was presented to directly show his intent*.  The circumstances unquestionably establish that at the least the accused intended to gratify his lust and sexual desires by having sexual intercourse with the victim, and that he unlawfully entered her home for that purpose.

48 C.M.R. at 996 (emphasis added).

In finding a failure of proof on the element of "without her consent," the *Polk* court noted:

> His very first words to the victim were in essence a disavowal of any intention to inflict serious harm to her and an effort to calm her fears.  Indeed, moments after her initial fright, the victim realized that she was not being harmed in any way and that she would be able to reason intelligently with the accused.  His conversation and actions from that point amounted to nothing more than an atrocious and gross attempt to persuade the victim to consent to intercourse.  It may well be that no reasonable man could expect to accomplish a seduction in the manner undertaken by the accused, but that is not the point. The fact is that the evidence does not show that the accused intended to have intercourse with the victim *without her permission and assent.*

*Id.* at 997 (emphasis added).  Finally, in reaching its decision the *Polk* court took note of the following:  the accused's "desistance" upon the victim's refusal to consent; "a singular absence of the application of force and brutality by the accused to accomplish his sexual desires;" the absence of any effort by appellant to remove the blanket that covered his victim; and the absence of any sexual foreplay.  *Id.*

The case at bar is distinguishable from *Polk*.  Appellant was tried applying the elements of rape found in Article 120 of the UCMJ as amended in 2007.  *See* 10 U.S.C. § 920(b)(1)(a) (2006 & Supp. II 2008).  The specific intent in appellant's

case is a specific intent to "engage in a sexual act . . . by using force."  Sexual act is defined as:

> (A) contact between the penis and the vulva, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight; or
>
> (B) the penetration, however slight, of the genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person.

*M.C.M.*, pt. IV, ¶45.a.(t)(1).  In *Polk,* digital penetration of "the woman" failed to meet the definition of intercourse under the 1969 version of Article 120, UCMJ.  In contrast, digital penetration is sufficient, "however slight," to meet the definition of sexual act sufficient for attempted rape as charged in appellant's case.  Next, unlike *Polk* where the accused only made contact with the victim's neck and jaw, the appellant straddled his victim and moved his hand from above her navel to below the navel, towards her crotch.  In *Polk,* the accused eventually left the victim's bedroom when asked.  Appellant only left DR's room after she was able to remove the mask covering his face and reveal his identity.  In *Polk* the accused never struck his victim or injured her whereas appellant beat his victim in an effort to subdue her, causing injuries to her face and eye.  Unlike the accused in *Polk*, appellant, by all accounts, removed the blanket covering DR, exposing her bare breasts.  The victim in Polk remained covered throughout the accused's presence.

Finally, the accused in *Polk* did not provide a pretrial statement nor did he testify at his trial, leaving the trier of fact to infer Sergeant Polk's intent "from all of the circumstantial evidence surrounding the offenses, that is, from the acts done and the things said at the time."  No such limitation exists in appellant's case as appellant chose to take the stand, using his time on the stand to spin a yarn of incredible proportions.  To say appellant's testimony strains credulity is an understatement.  Scientific evidence, specifically pink fibers found on male sweat pants in appellant's home and DNA evidence found on a glove in DR's bedroom, places appellant on top of DR in her bedroom.  Appellant's explanation for the glove with his DNA is that someone must have taken the glove from his garbage and placed it in the bedroom.  Appellant hints at the possibility that DR or her husband placed the glove in the bedroom; however, the motive for either DR or DR's husband to falsely accuse appellant of attempted rape is non-existent.  When asked by his trial defense counsel to explain why he called his squad leader and said he "fucked up," appellant stated:  "I was talking about going AWOL, sir."  When asked by his trial defense counsel if his statement related to him assaulting anyone, tying to rape anyone, or breaking into someone's home, appellant replied to all three in the negative.  Appellant then went on to deny assaulting DR or breaking into her home

on 28 May 2009.  Appellant ended his direct testimony by also denying any assault upon DC.

Appellant's contends there is "no evidence presented demonstrating the alleged victim's attacker possessed the specific intent to rape."  Both the appellant's brief as well as the appellee's brief rely extensively on *Polk* to compare appellants' actions to those of Sergeant Polk.  As already noted, *Polk* is a case decided on a failure of proof on the element of "without consent."  Factually, *Polk* differs significantly from appellants' case.  Lastly, unlike Sergeant Polk, appellant testified on the merits.  Appellant himself, by deciding to testify, provided direct evidence of the assault upon DR, the intent to rape DR, and the unlawful entry into DR's home.

As this court recently noted:

> the panel in appellant's case was free to disbelieve appellant's testimony and free to consider that testimony as substantive evidence of guilt. "A trier of fact is not compelled to accept and believe the self serving stories of vitally interested defendants. Their evidence may not only be disbelieved, but from the totality of the circumstances, including the manner in which they testify, a contrary conclusion may be properly drawn." *United States v. Cisneros*, 448 F.2d 298, 305–06 (9th Cir. 1971) (citing *Dyer v. MacDougall*, 201 F.2d 265, 268 (2d Cir. 1952)).

*United States v. Pleasant*, 71 M.J. 709, 714 (Army Ct. Crim. App. 2012) *pet. denied* 73 M.J. 385 (C.A.A.F. 2013).

> When an accused testifies on his own behalf, he does so at his own peril, risking that he might fill in gaps or provide affirmative evidence contributing to or resulting in his conviction. As the Supreme Court early established, a trier of fact necessarily assesses the veracity of an accused's testimony and considers it when resolving questions of guilt or innocence:
>
> "Nor can there be any question that, if the jury were satisfied, from the evidence, that false statements in the case were made by defendant, or on his behalf, at his instigation, they had the right, not only to take such statements into consideration, in connection with all the other circumstances of the case, in determining whether or not defendant's conduct had been satisfactorily explained by him upon the theory of his innocence, but also to regard false statements in explanation or defense, made or

> procured to be made, as in themselves tending to show guilt. The destruction, suppression, or fabrication of evidence undoubtedly gives rise to a presumption of guilt, to be dealt with by the jury."

*Pleasant*, 71 M.J. at 712-13 (quoting *Wilson v. United States,* 162 U.S. 613, 620–21, 16 S.Ct. 895, 40 L.Ed. 1090 (1896)).

As the Air Force court noted in *Polk*, intent must be determined based on the totality of the circumstances. *Polk*, 48 C.M.R. at 996. *Cf. United States v. Webb*, 38 M.J. 62, 69 (C.M.A.1993) (in case of housebreaking with intent to "peep," intent may be inferred from totality of circumstances to include "nature, time, or place of" appellant's "acts before and during" the crime alleged) (quoting *Goldman v. Anderson*, 625 F.2d 135, 137 (6th Cir. 1980)). "Intent is a state of mind difficult of proof by direct evidence. It may, however, be established by circumstantial evidence and by inferences reasonably to be drawn from the conduct of the defendant and from all the attendant circumstances in the light of human behavior and experience." *State v. Casady*, 491 N.W.2d 782, 787 (Iowa 1992). "[A defendant] will generally not admit later to having the intention which the crime requires . . . his thoughts must be gathered from his words (if any) and actions in light of surrounding circumstances." *State v. Radeke,* 444 N.W.2d 476, 478–79 (Iowa 1989) (quoting W. La Fave & A. Scott, *Handbook on Criminal Law* § 3.5(f), at 226 (2d ed. 1986) (brackets in original)).

The military judge, consistent with the standard instruction in the Military Judges' Benchbook and consistent with our precedent, as well as federal and state law precedent, instructed the panel members as follows:

> I have instructed you that the accused's specific intent to commit rape for the offense of attempted rape, and the accused's specific intent to commit assault consummated by a battery, for the offense of housebreaking, must be proved beyond a reasonable doubt. Direct evidence of intent is often unavailable. The accused's intent, however, may be proved by circumstantial evidence. In deciding this evidence, you must consider all relevant facts and circumstances as shown by the evidence in this case, as you recall it.

*See* Dep't of Army, Pam. 27–9, Legal Services: Military Judges' Benchbook, para. 7-3 (Note 2) (1 Jan. 2010).

Considering the entire record, to include the appellate pleadings as well as the matters personally submitted by appellant pursuant to *United States v. Grostefon*, 12

M.J. 431 (C.M.A. 1982), we are convinced beyond a reasonable doubt that appellant intended to rape DR on 28 May 2009 and that he is guilty of attempted rape. As such, we find the evidence factually sufficient. We specifically find the evidence, exclusive of appellants' testimony on the merits, factually sufficient to support his conviction for attempted rape. Any doubt that may have existed without consideration of appellant's merit's testimony is fully dispelled by the fanciful and incredible story he attempted to sell the panel, thus providing them with evidence related to his assault of DR, his intent to rape DR, and his unlawful entry of DR's home.[10]

### *LEGAL AND FACTUAL SUFFICIENCY OF APPELLANT'S ATTEMPTED RAPE CONVICTION (POST-CLOSING ARGUMENTS)*

Having found the evidence legally and factually sufficient, a finding by this court without regard to the government's closing argument in this case, we next address what impact, if any, trial counsel's rebuttal argument has on our decision. For the reasons noted below, our legal and factual sufficiency determinations are unchanged.

Prior to allowing counsel to argue, the military judge advised the panel members, in part, as follows:

> The law presumes the accused to be innocent of the charges against him and they are before you for your consideration. You will hear now an exposition of the facts for counsel for both sides as they view them. Bear in mind that the arguments of counsel are not evidence. Argument is made my (sic) counsel in order to assist you in understanding and evaluating the evidence but you must base your determination of the issues in this case on the evidence as you remember it and apply the law as I will instruct you. As the government has the burden of proof, trial counsel may open and close.

---

[10] The fact that the government chose to allege a battery as the intended criminal offense in support of the housebreaking charge instead of rape, while curious, does not change our decision regarding the sufficiency of the evidence in support of the attempted rape conviction. We note that the housebreaking charge was preferred on 2 July 2009 whereas the attempted rape, an "additional charge," was preferred on 24 September 2009. The passage of time and additional investigation is one possible and plausible explanation for the different pleadings; however, we need not decide why the intended crimes differ between housebreaking and attempted rape.

The trial counsel's primary argument was uneventful and otherwise unobjectionable. It spanned nine pages of a 932-page record, was approximately 1940 words in length, was un-objected to by the trial defense counsel, and resulted in no interruptions by the military judge.

The trial defense counsel's closing argument, consistent with his opening statement, stayed with the defense theme that appellant was not the individual that attacked and attempted to rape DR on 28 May 2009. The argument covered 29 pages of the record, was approximately 6,780 words in length, and was interrupted three times by government objection as well as three times by the military judge, the latter interruptions unrelated to the government's objections. Of note, two of the government's objections were "facts not in evidence" and the third was "improper argument." The military judge overruled all three. The military judge's sua sponte interruptions of trial defense counsel's argument were to advise the trial defense counsel of both the irrelevance and impropriety of expressing the trial defense counsel's personal views, thoughts, or opinions in closing argument.

The government's rebuttal argument spanned eight pages, consisted of approximately 1965 words, and, like their main argument, was made without objection by trial defense counsel or interruption by the military judge. At issue, and relevant to the sufficiency issue discussed earlier, are eight words spoken by the trial counsel near the close of the rebuttal argument. Trial counsel stated, inter alia: "[h]e lifted up his hand and reached his hand down. *Pulled out his penis; pulled her shorts down.* This act was going to happen." The italicized language, argued as error on appeal, was neither objected to nor resulted in any curative instruction by the military judge. All parties agree, and a review of the record confirms that there was no evidence presented that DR's attacker either pulled out his penis or pulled down DR's shorts during the 28 May 2009 attack.

After closing argument by counsel and at the close of the substantive and procedural instructions, the military judge advised the members they would be provided a written copy of the instructions for their use during deliberations. A review of Appellate Exhibit XXXIX of the record of trial, entitled "Findings Instructions – US v. Guzman" confirms that the prefatory instruction, verbally provided by the military judge advising members that argument by counsel is not evidence, was also provided to them in writing prior to their deliberation on findings. In addition to instructing the members that argument of counsel was not evidence, the military judge also specifically instructed the members that, with regard to the intent necessary to convict for attempted rape and housebreaking, the members "must consider all relevant facts and circumstances as shown by the evidence in this case, as [they] recall it." This instruction came after counsels' argument.

A court-martial panel must reach its decision "based only on the facts in evidence." *United States v. Fletcher*, 62 M.J. 175, 183 (C.A.A.F. 2005) (citing *United States v. Bouie*, 9 C.M.A. 228, 233, 26 C.M.R. 8, 13 (1958)). Arguments by counsel are not evidence. *United States v. Clifton*, 15 M.J. 26, 29 (C.M.A. 1983). Trial counsel inserted into appellants' case facts not in evidence when he argued "[appellant] *Pulled out his penis; pulled her shorts down*." The statement before the italicized language, "[h]e lifted up his hand and reached his hand down," is supported by the record and the statement following, "[t]his act was going to happen," is "reasonable comment on the evidence." *See* R.C.M. 919(b); *see also United States v. Paige*, 67 M.J. 442, 448 (C.A.A.F. 2009). Notwithstanding the absence of any evidence of record to support the "penis . . . shorts down" argument, trial defense counsel did not object. Therefore, we examine trial counsel's argument for plain error. *United States v. Halpin*, 71 M.J. 477, 479 (C.A.A.F. 2013); *United States v. Schroeder*, 65 M.J. 49, 58-59 (C.A.A.F. 2007); *see also* R.C.M. 919(c).

To prevail under a plain error analysis, appellant must show that: "'(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right.'" *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007) (citations omitted). Trial counsel's argument was error and it was plain or obvious. The issue to be resolved is whether, considering the totality of the circumstances, the error materially prejudiced a substantial right of the appellant. As our superior court noted in *United States v. Fletcher*, "in assessing prejudice, we look at the cumulative impact of any prosecutorial misconduct on the accused's substantial rights and the fairness and integrity of his trial." 62 M.J. 175, 184 (C.A.A.F. 2005). The courts look to three factors to assess prejudice: "(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction." *Id*. Considering the totality of the circumstances, can we be "confident that the members convicted [appellant] on the basis of the evidence alone." *Fletcher*, 62 M.J. at 185.

Applying the factors we find that appellant suffered no material prejudice as a result of trial counsel's improper argument. Considering factor 1, "the severity of the misconduct," the evidence establishes that the misconduct is not severe. Of the near 17 pages of government argument and near 4,000 words spoken, the trial counsel, for reasons unclear in the record, inserted facts not in evidence into the argument with a mere eight words. That said, the trial counsel spoke the words only once, the words were not inflammatory, and, provided the panel members followed the military judges oral and written instructions, the panel members would rely on their recollection of the evidence instead of that summarized by the trial counsel. Nothing in the record leads us to believe that the panel members did anything but follow the military judge's oral and written instructions. *See United States v. Jenkins*, 54 M.J. 12, 20 (C.A.A.F. 2000) (panel members are presumed to follow a military judge's instructions). Factor two, "measures adopted to cure the misconduct" favors appellant in that the military judge failed to take any action to

correct the improper argument. Factor 3, "the weight of the evidence supporting the conviction," for the reasons previously noted, favors the government.

As noted previously, any doubt whatsoever regarding appellant's guilt after the government's case was unquestionably dispelled following appellant's merits testimony and long before closing arguments. We are confident, beyond any doubt, that the panel convicted appellant on the basis of the evidence alone.

*POST-TRIAL DELAY*

Appellant alleges, in his supplemental pleadings before this court, that the dilatory post-trial processing of his case warrants relief under *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006) and *United States v. Collazo*, 53 M.J. 721 (Army Ct. Crim. App. 2000).

"Due process entitles convicted servicemembers to a timely review and appeal of court-martial convictions." *United States v. Arias*, 72 M.J. 501, 504 (Army Ct. Crim. App. 2013) (citations omitted). In *Arias*, this court summed up the standards established by our higher court in *Moreno* in assessing whether any delay rises to the level of a due process violation and how those standards are evaluated in light of the Supreme Court's decision in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972).

> [T]he timeliness of post-trial processing focuses on three distinct phases of the process: the time from completion of the trial until initial action (Phase I); the time between initial action on the case and docketing of the record of trial by the service Court of Criminal Appeals (CCA) (Phase II); and the time from docketing of the record of trial until completion of appellate review and rendering of a decision by the CCA (Phase III). *Moreno,* 63 M.J. at 142. The *Moreno* Court established post-trial processing standards for all three phases which, if exceeded, result in presumptively unreasonable post-trial delay: Phase I–120 days; Phase II–30 days; and Phase III–18 months. *Id.* Whether the post-trial processing rises to the level of a due process violation, however, hinges on application and analysis of the four factors articulated in *Barker v. Wingo:* "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice," with no one factor being dispositive. *Moreno,* 63 M.J. at 135–136. In assessing the fourth factor of prejudice, the *Moreno* Court cited to three sub-factors: "(1) prevention of oppressive incarceration

26

> pending appeal; (2) minimization of anxiety and concern
> of those convicted awaiting the outcome of their appeals;
> and (3) limitation of the possibility that a convicted
> person's grounds for appeal, and his or her defenses in
> case of reversal and retrial, might be impaired." *Id.* at
> 138–39 (quoting *Rheuark v. Shaw,* 628 F.2d 297, 303 n.8
> (5th Cir. 1980)). "[T]he appropriate test for the military
> justice system is to require an appellant to show
> particularized anxiety or concern that is distinguishable
> from the normal anxiety experienced by prisoners awaiting
> an appellate decision." *Id.* at 140.

*Arias*, 72 M.J. at 504-05.  If the above analysis results in a finding of a due process violation, relief is warranted unless "we are convinced beyond a reasonable doubt that the constitutional error is harmless beyond a reasonable doubt."  *United States v. Luke*, 69 M.J. 309, 321 (C.A.A.F. 2011).

A review of the post-trial processing timeline of appellant's case reveals a presumptively unreasonable delay for both Phase I and Phase III processing in that they exceeded 120 days and 18 months respectively.  Therefore, *Barker v. Wingo* factor 1, length of delay, favors appellant.  Factor 2 also favors appellant in that the record is silent regarding any reasons for the delay.  Factor 3 likewise favors appellant in that he twice demanded, via motions granted by this court, expedited review of his appeal.

Review of factor 4 under *Barker v. Wingo*, prejudice, requires review of the three sub-factors articulated in *Moreno*:  "(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired." *Moreno*, 63 M.J. at 138–39 (quoting *Rheuark* 628 F.2d at 303 n.8).

Considering Defense Appellate Exhibit C (DAE C), appellant's declaration under penalty of perjury, and appellate counsel's supplemental pleadings related to post-trial delay, we find that sub-factors 1, "prevention of oppressive incarceration pending appeal," and sub-factor 3, "limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired," favor the government in that appellants argument in support of both rely on the mistaken belief that he is entitled a sentence rehearing because of the legal and factual insufficiency of his attempted rape conviction.  In other words, because the government conceded sufficiency of appellant's conviction, it is argued that appellant should be released, and every day that goes by, he is subjected to oppressive incarceration, and his case, in the event of a retrial, might be impaired.

Appellant's argument is premised on this court's acceptance of the government's concession on the legal and factual sufficiency of appellant's attempted rape conviction, a concession we have rejected.

We next look at *Moreno* sub-factor 2, "minimization of anxiety and concern of those convicted awaiting the outcome of their appeals," in assessing prejudice. Assuming arguendo appellant's anxiety increased upon receipt of the government pleadings wherein they conceded legal and factual sufficiency of the most serious charge in appellant's case, the attempted rape, appellant fails to show how this increased anxiety is "particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Moreno*, 63 M.J. at 140. We find that appellant's increased anxiety, as articulated in DAE C, anxiety based on an erroneous belief that somehow this court, or any appellate court, is bound by a government concession is not that degree or type of "anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." Assuming arguendo appellant meets *Moreno* sub-factor 2, we find, considering all three *Moreno* sub-factors, no prejudice to appellant in the post-trial processing of his case.

Considering *Barker's* four factor analysis as modified by *Moreno's* three sub-factors to assess prejudice, we find no due process violation in the post-trial processing of appellant's case. We further find that "the post-trial processing of appellant's case was not 'so egregious that tolerating it would adversely affect the public's perception of the fairness and integrity of the military justice system." *Arias*, 72 M.J. at 507 (quoting *United States v. Toohey,* 63 M.J. 353, 362 (C.A.A.F. 2006)).

Assuming arguendo that the anxiety suffered by appellant as noted in DAE C is sufficient to establish prejudice and further assuming that the delay in appellant's case rises to the level of a due process violation, we find that the violation is harmless beyond a reasonable doubt. *See e.g.*, *United States v. Luke*, 69 M.J. 309, 321 (C.A.A.F. 2011) (assuming error, over eleven year delay between completion of appellant's court-martial and issuance of the service court's decision found harmless beyond a reasonable doubt); *United States v. Bush*, 68 M.J. 96, (C.A.A.F. 2009) (seven year delay in docketing case at service court was harmless beyond a reasonable doubt); *United States v. Allende*, 66 M.J. 142, 145 (C.A.A.F. 2008) (court assumed due process violation however found seven years between sentencing and completion of review harmless); *United States v. Harrow*, 65 M.J. 190, 206 (C.A.A.F. 2007) (1,467 days between sentencing and completion of review harmless beyond a reasonable doubt); *United States v. Canchola*, 64 M.J. 245, 246-47 (C.A.A.F. 2007) (no due process violation with 783 days between sentencing and action); *United States v. Haney*, 64 M.J. 101, 107 (C.A.A.F. 2006) (finding due process violation but no prejudice with seven years between sentencing and completion of review); *United States v. Gosser*, 64 M.J. 93, 97-99 (C.A.A.F. 2006)

(548 days between sentencing and action violated appellant's due process right to speedy review but violation was harmless); *United States v. Finch*, 64 M.J. 118, 125 (C.A.A.F. 2006) (assuming due process violation, 381 days between sentencing and action was harmless beyond a reasonable doubt); *see also United States v. Rodriguez-Rivera*, 63 M.J. 372, 386 (C.A.A.F. 2006) (no additional relief warranted in case delayed over six years between sentencing and completion of review where, despite due process violation, "to fashion relief that would be actual and meaningful . . . would be disproportionate to the possible harm generated from the delay").

Finally, we turn to our obligation to ensure sentence appropriateness considering the overall post-trial processing of appellant's case. *See* Article 66(c), UCMJ. "Article 66(c), UCMJ, requires this court to assess the appropriateness of appellant's sentence in light of any dilatory post-trial processing of his case. . . . Article 66(c), UCMJ, also empowers this court to grant relief when there has been unreasonable post-trial processing, notwithstanding the absence of actual prejudice." *Arias*, 72 M.J. at 507 (citations omitted).

Having considered the entire record, *Moreno's* Phase I, II, and III standards and the presumptions therein, the lack of any documented explanation or justification by the government for the post-trial processing of appellant's case, the particular facts and circumstances of this case to include appellant's declaration under penalty of perjury and multiple demands for expedited appellate review, we find the sentence approved by the convening authority appropriate.

## CONCLUSION

On consideration of the entire record, the assigned errors, the allegations raised by appellant pursuant to *United States v. Grostefon,* and the briefs submitted by the parties, we conclude the findings of guilty and the sentence, as approved by the convening authority, are correct in law and fact. Accordingly, the findings of guilty and the sentence are AFFIRMED.

Senior Judge KERN and Judge MARTIN concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

Appendix

| Date | Event | Day |
|------|-------|-----|
| • 14 Jan 10 | Announcement of Sentence/Completion of Trial | 1 |
| • 20 Jan 10 | Appellant Requests Deferment | 7 |
| • 18 Feb 10 | Convening Authority Approves Deferment Request | 36 |
| • 24 May 10 | Record of Trial to Defense Counsel for Errata Review | 131 |
| • 21 Jun 10 | Defense Counsel Completes Errata Review | 159 |
| • 7 Jul 10 | Military Judge Authenticates the Record of Trial | 175 |
| • 15 Sep 10 | Authenticated Record of Trial Received by Appellant | 245 |
| • 25 Sep 10 | Additional 20 Days to Submit Post-Trial Matters Requested | 255 |
| • 15 Oct 10 | Post-Trial Matters Submitted by Appellant | 275 |
| • 7 Dec 10 | Initial Action Taken by the Convening Authority | 328 |
| • 14 Dec 10 | Army Court of Criminal Appeals Receives Appellant's Record | 335 |
| • 31 Jan 11 | Defense Appellate Division – 1st Extension Granted | 383 |
| • 2 May 11 | Defense Appellate Division – 2d Extension Granted | 475 |
| • 11 Aug 11 | Defense Appellate Division – 3d Extension Granted | 576 |
| • 6 Sep 11 | Defense Appellate Division – 4th Extension Granted | 602 |
| • 3 Oct 11 | Defense Appellate Division – 5th Extension Granted | 627 |
| • 9 Nov 11 | Brief on Behalf of Appellant Submitted | 664 |
| • 9 Nov 11 | Motion to Attach Defense Appellate Exhibits A and B Submitted | 664 |
| • 17 Nov 11 | Motion to Attach Defense Appellate Exhibits A and B Granted | 672 |
| • 5 Dec 11 | Government Appellate Division – 1st Extension Granted | 690 |
| • 9 Mar 12 | Government Appellate Division – 2d Extension Granted | 785 |
| • 6 Jun 12 | Brief on Behalf of Appellee Submitted | 874 |
| • 12 Jul 12 | Reply Brief on Behalf of Appellant Submitted | 910 |
| • 6 Nov 12 | Motion to Attach Additional *Grostefon* Matters Submitted | 1027 |
| • 13 Nov 12 | Motion to Attach Additional *Grostefon* Matters Granted | 1034 |
| • 7 May 13 | Motion for Expedited Review Submitted | 1209 |
| • 7 May 13 | Motion to Attach Defense Appellate Exhibit C Submitted | 1209 |
| • 13 May 13 | Motion for Expedited Review Granted | 1215 |
| • 13 May 13 | Motion to Attach Defense Appellate Exhibit C Granted | 1215 |
| • 3 Jun 13 | Motion to Substitute Defense Appellate Exhibit C Submitted | 1236 |
| • 6 Jun 13 | Motion to Substitute Defense Appellate Exhibit C Granted | 1239 |
| • 22 Jul 13 | Motion to File Supplemental Assignment of Error Out of Time and Request for Expedited Review Submitted | 1285 |
| • 22 Jul 13 | Supplemental Assignment of Error Submitted | 1285 |
| • 23 Jul 13 | Motion to File Supplemental Assignment of Error Out of Time and Request for Expedited Review Granted | 1286 |
| • 2 Aug 13 | Supplemental Brief on Behalf of Appellee | 1296 |
| • 20 Sep 13 | -------------------------------------------------- | 1345 |