IN THE CASE OF

UNITED STATES, Appellee

v.

Javier SANTOS, Sergeant
U.S. Army, Appellant

No. 03-0093

Crim. App. No. 9900559

United States Court of Appeals for the Armed Forces

Argued October 21, 2003

Decided March 23, 2004

EFFRON, J., delivered the opinion of the Court, in which
GIERKE, BAKER, and ERDMANN, JJ., joined. CRAWFORD, C.J., filed
an opinion concurring in the result.

Counsel

For Appellant: Captain Michael L. Kanabrocki (argued); Colonel
Robert D. Teetsel, Lieutenant Colonel Mark Tellitocci, and
Major Sean S. Park (on brief); Lieutenant Colonel E. Allen
Chandler, Jr., Major Jeanette K. Stone, and Captain Linda A.
Chapman.

For Appellee: Captain Timothy Litka (argued); Colonel Lauren B.
Leeker, Lieutenant Colonel Margaret B. Baines, and Major
Theresa A. Gallagher (on brief).

Military Judges: R. J. Hough and S. R. Henley

THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.

Judge EFFRON delivered the opinion of the Court.

At a general court-martial composed of a military judge sitting alone, Appellant was convicted, pursuant to mixed pleas, of one specification of violation of a lawful order, two specifications of assault consummated by a battery, five specifications of aggravated assault, one specification of communicating a threat, one specification of indecent assault, and one specification of kidnapping, in violation of Articles 92, 128, and 134, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 892, 928 and 934 (2000). He was sentenced to a dishonorable discharge, confinement for 10 years, total forfeitures, and reduction to Private E-1. The convening authority approved these results and provided Appellant with 181 days of pretrial confinement credit against the sentence. The Court of Criminal Appeals affirmed in an unpublished summary opinion.

On Appellant's petition, we granted review of the following issue:

> WHETHER THE ARMY COURT OF CRIMINAL APPEALS
> ERRED IN RULING THAT THE GOVERNMENT DID NOT
> VIOLATE PETITIONER'S DUE PROCESS RIGHTS
> UNDER BRADY v. MARYLAND, THE CONFRONTATION
> CLAUSE OF THE SIXTH AMENDMENT TO THE
> CONSTITUTION, AND ARTICLE 46 OF THE UCMJ BY
> FAILING TO DISCLOSE EXCULPATORY, FAVORABLE
> AND MATERIAL EVIDENCE TO THE DEFENSE WHICH
> IT KNEW ABOUT OR SHOULD HAVE KNOWN ABOUT
> WHERE THE PROSECUTION WITHHELD CRITICAL
> IMPEACHMENT EVIDENCE THAT WOULD HAVE PROVEN

2

> THAT [Ms. AM] NOT ONLY COMMITTED PERJURY AT
> TRIAL, BUT THAT SHE ALSO HAD STRONG BIASES,
> PREJUDICES, AND MOTIVES TO FABRICATE THE
> CHARGE AGAINST PETITIONER.

For the reasons set forth below, we hold that any error with respect to discovery was not prejudicial, and therefore affirm.

## I. BACKGROUND

### A. FACTUAL SETTING

#### 1. Testimony at the Article 32 hearing

The granted issue concerns the charge that Appellant committed an indecent assault against Ms. AM. At a pretrial investigation hearing under Article 32, UCMJ, 10 U.S.C. § 832 (2000), testimony by Ms. AM included the following matters. She dated Appellant at various times in 1997, and she was with Appellant at her mother's house on a night in the late summer. When he sought to engage in sexual intercourse with her, she rebuffed him. Despite her repeated requests that he stop, he performed an act of oral sodomy on her. He then pulled down his pants, lay on top of her, touched his penis to her vagina, and attempted to penetrate her while she pleaded with Appellant to stop. When he did not respond, she pinched him, and she was able to extricate herself from the situation. Based upon this

information, an indecent assault charge was added to the original charges against Appellant.

2. Defense discovery requests

Defense counsel's initial discovery request, submitted to the trial counsel on February 19, 1999, included the following:

> Any known evidence tending to diminish [the] credibility of any witness including . . . evidence of other character, conduct, or bias bearing on witness credibility under M.R.E. 608 . . . Specifically[,] information pertaining to . . . Ms. [AM] . . . . The defense also requests any other evidence in the possession of the government favorable to the accused, or tends [sic] to negate the guilt of the accused of an offense charged, or reduce the punishment for an offense charged.

On April 7, 1999, defense counsel submitted a supplemental discovery request to obtain:

> Any and all statements made by [Ms. AM]. Specifically[,] all sworn statements made by [Ms. AM] to CID [the Army Criminal Investigations Command (CID)] concerning the investigation into the death of PFC Chaffin [sic].

During the CID investigation noted in the discovery request, the CID agents at one point treated Appellant as a suspect in the death of Private First Class (PFC) Jason Chafin. Eventually, however, charges were brought against two other service members, and Appellant was not charged in connection with the death of PFC Chafin.

### 3.  The Government's response to the discovery requests

The Government, in response to the foregoing requests, provided defense counsel with two documents.  The first document, a report by the Colorado Springs Police Department, contained a detective's summary of an interview with Ms. AM on February 3, 1998.  According to the summary, Ms. AM stated that when she met Appellant in early 1997, they were only friends, and she did not consider herself to be his girlfriend.  They fell out of touch, but he started contacting her again towards the end of the summer.  The summary primarily addressed events on August 29, 1997, the evening that PFC Chafin disappeared. During the interview, Ms. AM denied seeing Appellant or his friends that evening.  When she returned home after the interview, Ms. AM called the investigator to state that she remembered more details.  Specifically, she recalled that she saw Appellant and his friend, Specialist (SPC) Neal Johnson, on August 29, 1997, when they came to a friend's apartment that evening at approximately seven o'clock, but that they left no longer than five minutes later.

The second document, a sworn statement given by Ms. AM to the CID on February 9, 1999, concerned the allegation that Appellant had indecently assaulted her in the summer of 1997. In the statement, Ms. AM said that Appellant "often ask[ed her]

5

to marry him and to have sexual intercourse with him, which [she] never did." With respect to the night in question, Ms. Am stated that after Appellant arrived at her mother's residence, they went into Ms. AM's bedroom. Appellant kissed her and asked to have sexual intercourse, to which she said no. He pushed her down, took off her pajama pants, pulled down his pants and attempted penetration of her vagina. When he did not respond to her requests to stop, she pinched him so that she could extricate herself. She was able to do so, and the assault ceased. In her sworn statement, Ms. AM did not mention the act of oral sodomy that had been discussed during her testimony at the Article 32 hearing.

4.  Consideration of the indecent assault charge at trial

At trial, Ms. AM testified that she did not consider their relationship to be that of boyfriend and girlfriend. Although she kissed Appellant on occasion, she did not allow their interaction to proceed further in terms of sexual contact. Appellant repeatedly expressed his desire to marry her prior to his pending deployment to Kuwait, and he sought to induce her to marry him promising to leave his car with her if they wed. She testified that she told him that they should "just wait, wait 'till he got back."

With respect to the indecent assault allegation, Ms. AM testified that Appellant repeatedly attempted to engage her in

sexual contact, she eventually allowed him to remove her pajama pants. At that time, he performed an act of oral sodomy on her without her consent. The balance of her testimony provided a description of the incident similar to her testimony at the Article 32 hearing and her statement to the CID. She added that she first told the CID about the alleged indecent assault in January 1998 during the CID's investigation into PFC Chafin's disappearance. According to Ms. AM, the CID agents asked her about Appellant's character, and she told them about the alleged assault.

During cross-examination, defense counsel relied upon both of the documents obtained during discovery. Defense counsel first called her attention to the summary of her interview with the Colorado Springs Police Department, which concerned the disappearance of PFC Chafin. Defense counsel noted that the interview summary contained no claim by Ms. AM that she had been sexually assaulted by Appellant. Defense counsel suggested that the summary contradicted her statement on direct examination that she had reported the alleged indecent assault to authorities investigating PFC Chafin's disappearance.

Defense counsel then used the second document, the sworn statement given by Ms. AM to the CID, in an effort to impeach her credibility. Counsel contrasted her testimony at trial with her earlier sworn statement. At trial, she stated that

7

Appellant had performed an act of oral sodomy on her during the evening in question, but the sworn statement did not mention oral sodomy.

During the defense case, Appellant testified on his own behalf. He stated that during his relationship with Ms. AM, he did not engage in any sexual activity, including oral sodomy. He further testified that although he did see Ms. AM during Labor Day weekend in 1997, he was dating another individual exclusively. He added that his military duties during the latter part of the summer had kept him away from the area while his unit was performing field exercises.

Appellant expressly disputed Ms. AM's statement that he wanted to marry her. He testified that Ms. AM wanted to engage in a sham marriage so that she could move out of her mother's home. According to Appellant, Ms. AM attempted to persuade him to marry her by telling him that he would receive extra compensation as a married soldier. She assured him that they could live in separate rooms, he could still date other women, and she would take care of his car while he was in Kuwait.

Appellant also testified that during his deployment in Kuwait, he received letters from Ms. AM. He stated that the letters, which were not produced at trial, contained an apology from Ms. AM for not telling the truth when she told law enforcement that Appellant was not present at her friend's

8

apartment on the night that PFC Chafin was murdered. According to Appellant, she also stated that she wanted to have a relationship with Appellant when he returned from Kuwait.

During his closing argument on findings, trial counsel portrayed Ms. AM as a reluctant witness, who had "no vendetta" against Appellant. The prosecution theme was that she had simply provided information to law enforcement officials who asked her about Appellant during their investigation of an unrelated case, PFC Chafin's disappearance. Defense counsel's closing statement sought to portray Ms. AM as untruthful and focused on the lengthy period of time that elapsed between the alleged incident and her statements to law enforcement authorities. At the conclusion of the arguments, the military judge deliberated, and entered findings that convicted Appellant of a number of charges and acquitted him of others. Appellant was convicted of the charge that he indecently assaulted Ms. AM.

5.   Post-Trial Developments

After the trial was concluded, Appellant asked the CID to provide him with documents related to the investigation of his case. The CID response included a number of documents generated in connection with the disappearance of PFC Chafin, a crime that was not the subject of charges in the present case. The documents from the Chafin investigation had not been included in

9

the prosecution's response to the defense discovery requests in the present case.

In this appeal, Appellant contends that six of the documents that he received after the trial would have enabled him to undermine the credibility of Ms. AM at trial. Appellant further contends that failure to provide those document's during discovery requires reversal of the indecent assault conviction. We shall first summarize the legal standards applicable to review of discovery issues, and then apply those standards to the documents at issue in this appeal.

## II. DEFENSE DISCOVERY IN THE MILITARY JUSTICE SYSTEM

The military justice system provides for broader discovery than required by practice in federal civilian criminal trials. See United States v. Williams, 50 M.J. 436, 439-40 (C.A.A.F. 1999). Article 46, UCMJ, 10 U.S.C. § 846 (2000), mandates that "[t]he trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe." The President has implemented Article 46 in Rule for Courts-Martial 701 [hereinafter R.C.M.].

R.C.M. 701(a)(2)(A) requires the Government, upon defense request, to allow inspection of any tangible objects, such as papers and documents, that "are within the possession, custody,

or control of military authorities, and which are material to the preparation of the defense." Regardless of whether the defense has made a request, the Government is required to disclose known evidence that "reasonably tends to" negate or reduce the degree of guilt of the accused or reduce the punishment that the accused may receive if convicted. See R.C.M. 701(a)(6); see also Williams, 50 M.J. at 440 (noting that R.C.M. 701(a)(6) implements the disclosure requirements of Brady v. Maryland, 373 U.S. 83 (1963)). Evidence that could be used at trial to impeach witnesses is subject to discovery under these provisions. See United States v. Watson, 31 M.J. 49, 54 (C.M.A. 1990)(citing Giglio v. United States, 405 U.S. 150 (1972)).

If the Government fails to disclose discoverable evidence, the error is tested on appeal for prejudice, which is assessed "in light of the evidence in the entire record." United States v. Stone, 40 M.J. 420, 423 (C.M.A. 1994)). As a general matter, when an appellant has demonstrated error with respect to nondisclosure, the appellant will be entitled to relief only if there is a reasonable probability that there would have been a different result at trial if the evidence had been disclosed. When an appellant has demonstrated that the Government failed to disclose discoverable evidence with respect to a specific request or as a result of prosecutorial misconduct, the

appellant will be entitled to relief unless the Government can show that nondisclosure was harmless beyond a reasonable doubt. See United States v. Roberts, ___ M.J. ___ (C.A.A.F. 2004).

## III. DISCUSSION

Under the standards set forth in Roberts and the cases cited therein, an appellate court may resolve a discovery issue without determining whether there has been a discovery violation if the court concludes that the alleged error would not have been prejudicial. For purposes of this appeal, we shall assume without deciding: (1) that the documents at issue were material to the preparation of the defense and should have been disclosed in response to the discovery request; and (2) that failure to do so should be tested for prejudice on appeal under the harmless beyond a reasonable doubt standard. The documents at issue were generated by the CID during investigation of PFC Chafin's disappearance. That investigation did not result in charges against Appellant, either with respect to PFC Chafin's disappearance or with respect to his relationship with Ms. AM. The documents do not directly address the allegation that Appellant indecently assaulted Ms. AM.

The first document cited by the defense is a redacted CID report dated September 21, 1998, summarizing an interview of Ms. AM. According to the summary:

12

> [Ms. AM] was using [Appellant] for his
> vehicle but they did not have sexual
> relations.  [Ms. AM] and [Appellant] talked
> about getting married so she could get out
> of her house and receive the extra money
> that spouses receive from the Army.
>
> [Ms. AM] would drive [Appellant's] vehicle a
> lot . . . but never would have sex with
> [Appellant].
>
> [Ms. AM] mentioned [Appellant] has a lot . .
> . of money everytime [sic] they were around
> each other.

This document is largely cumulative of other information available to Appellant at trial.  In view of Appellant's knowledge of his relationship with Ms. AM, as reflected in his testimony at trial, as well as his ability to establish that she had not made a timely report of the sexual assault allegations, the additional value of this document was minimal.  To the extent that the document addressed the issue of whether Ms. AM or Appellant was telling the truth at trial as to who initiated the discussion of marriage, the summary is ambiguous at best. In any case, it is unlikely that the military judge, as fact-finder, would have found it necessary to resolve this collateral issue in the course of adjudicating the indecent assault charge under the circumstances of this case, particularly where the defense did not rely upon consent.

The second set of documents includes five items regarding Appellant's whereabouts on the night PFC Chafin disappeared.

13

Two documents are redacted copies of CID reports, summarizing interviews with Ms. AM. Both indicate that Ms. AM had been at the apartment of a friend that night, and that neither Appellant nor his friend, SPC Johnson, had come to the apartment. A third document summarizes an agent's re-interview of Ms. AM, after she had acknowledged that Appellant had been at the apartment. The summary notes that in the third interview, Ms. AM said that Appellant had told her to tell the CID that he had not been at the apartment. The summary contains the agent's notation that either Appellant or Ms. AM was not telling the truth, and it contains a marginal notation, "Mention Reward." The other two documents contain statements by SPC Johnson, who indicated that he was with Appellant on the day in question and that they were at the apartment for some period of time at some point. The statements are rambling and lacking in detail, reflecting the impact of an apparently substantial quantity of alcoholic beverages consumed by SPC Johnson during that day.

The fact that Ms. AM had provided inconsistent statements to law enforcement officials about the evening in question was already known to the defense at trial, as reflected in other information provided during discovery and Appellant's own testimony. It is unlikely that the brief summaries and SPC Johnson's vague recollections would have enabled the military judge -- had he been inclined to do so -- to sort out what

14

happened on the night PFC Chafin disappeared. In any case, the military judge, as fact-finder, was well aware that Ms. AM had provided inconsistent information to law enforcement officials on that matter. Because that question had no more than a remote, collateral connection to the alleged indecent assault, the additional ambiguous information in the CID summaries and SPC Jonson's statements would not have had significant impact on the military judge's adjudication of the findings.

The review of discovery violations involves case-specific considerations. In another case, undisclosed documents from an unrelated investigation that cast doubt on the credibility of a witness might have greater value. In the present case, in light of the minimal probative value and utility of the undisclosed documents at issue, and in light of all the evidence presented in the record, we hold that any error in not providing these documents to Appellant during discovery was harmless beyond a reasonable doubt.

## DECISION

The decision of the United States Army Court of Criminal Appeals is affirmed.

CRAWFORD, Chief Judge (concurring in the result):

See my separate opinion in United States v. Roberts,
___ M.J. ___ (C.A.A.F. 2004)(concurring in the result).