# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

v.

## Captain BENJAMIN J. MOORE
### United States Air Force

## ACM 38773

## 7 September 2016

Sentence adjudged 14 November 2014 by GCM convened at Columbus Air Force Base, Mississippi. Military Judge: Joshua E. Kastenberg (sitting alone).

Approved Sentence: Dismissal, restriction to limits of Columbus Air Force Base, Mississippi, for 60 days, and a reprimand.

Appellate Counsel for Appellant: Major Lauren A. Shure.

Appellate Counsel for the United States: Major Jeremy D. Gehman and Gerald R. Bruce, Esquire.

Before

MAYBERRY, SPERANZA, and JOHNSON
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

SPERANZA, Judge:

A military judge sitting as a general court-martial convicted Appellant, contrary to his pleas, of two specifications of assault consummated by a battery for punching and kicking his wife, CW, in November 2012 and pushing her against a wall and onto the floor in March 2014; conduct unbecoming an officer and gentleman for wrongfully creating and sending pornographic or sexually explicit videos on divers occasions; and three specifications of committing adultery with another woman, CR. Articles 128, 133, and 134, UCMJ, 10 U.S.C. §§ 928, 933, 934. The military judge acquitted Appellant of three

other specifications alleging assault consummated by a battery against CW. The military judge sentenced Appellant to a dismissal, restriction to the limits of Columbus Air Force Base for 60 days, and a reprimand.[1] The convening authority approved the sentence as adjudged.

On appeal, Appellant requests the two assault specifications of which he was convicted be set aside because the Government failed to disclose certain material favorable to the Defense and was unable to show how such nondisclosure was harmless beyond a reasonable doubt. We disagree and affirm.

*Background*

CW and Appellant began their tempestuous marriage in April 2011. That fall, Appellant was selected for a 365-day deployment to Afghanistan. During temporary duty for pre-deployment training in the summer of 2012, Appellant met CR and began a sexual relationship with her. Appellant continued to communicate with CR after the training.

CW claimed Appellant threw her to the ground in the summer of 2012 when she and Appellant returned from driving CW's daughter to her biological father's home. CW asserted Appellant assaulted her again in November 2012 when he punched and kicked her during a confrontation inside their bathroom.

Appellant departed the United States for his deployment at the end of December 2012, but not before having sexual intercourse with CR near Baltimore, Maryland. During his deployment, Appellant and CR created and exchanged sexually explicit communications that included videos Appellant recorded in military facilities while wearing his duty uniform. Appellant redeployed to the United States near the middle of December 2013. Before returning home to his family in Alabama, Appellant once again had sexual intercourse with CR.

CW claimed Appellant assaulted her in her parent's basement after an altercation during a Christmas dinner in December 2013. CW also accused Appellant of pushing her against the wall and onto the floor of their home in March 2014 while he was trying to retrieve his phone from CW after she stated she was going to call CR.

Appellant testified during findings. Appellant acknowledged each of the assault allegations, but testified that he acted substantially in self-defense. Appellant admitted to having sexual intercourse with CR. Appellant also admitted to creating sexually explicit videos and exchanging sexually explicit material with CR.

---

[1] After findings, the military judge found the adultery specifications to be unreasonably multiplied for the purposes of sentencing and merged those specifications accordingly.

ACM 38773

Additional facts necessary to resolve the assignment of error are included below.

*Failure by the Government to Disclose Information*

In its initial discovery request, the Defense requested discovery of medical and mental health records, specifically CW's medical records related to treatment for any injuries, CW's prescription records from 1 January 2012 to the request date, CW's mental health records, and the curriculum vitae of any provider who treated CW.

The Government, with CW's consent, obtained sealed copies of CW's medical and prescription records, civilian mental health records, and military family health records. In a records request sent to providers dated 17 September 2014, trial counsel maintained that the requested records were "relevant and material because charges [had] been preferred against [Appellant] for multiple offenses under the UCMJ." Trial counsel further explained in the request that "[c]harges include assault consummated by a battery against [Appellant's] spouse, [CW], and adultery." The Government did not review any of the records nor did the Government provide any of the information to the Defense.

The Defense filed a second discovery request in which it renewed its specific request for CW's medical records, prescription records, mental health records, and provider information. In this second discovery request, the Defense also requested any marriage counseling and Family Advocacy records. The Defense further requested that any withheld material be identified for in camera review by the military judge.

In its response, the Government informed the Defense that CW asserted privilege over the requested records, including medical and prescription records, and would not release the records without an in camera review by the military judge. The Government agreed that an in camera review was appropriate and recommended the Defense file a motion accordingly. The Government indicated it could make the records available to the military judge, if ordered to do so.

The Defense moved to compel production of CW's mental health records, medical records, prescription records, and marriage records for an in camera review in accordance with Mil. R. Evid. 513. The Defense argued that an in camera review of the aforementioned records was constitutionally required to provide Appellant "the best possible defense." In its motion, the Defense indicated that it was aware, through evidence and witness interviews, of the following: CW would often drink heavily; CW had a prescription for anti-anxiety medication; CW appeared to others to be emotionally and physically unstable; CW threatened to commit suicide while holding a knife at or near the time of one of the alleged assaults; CW sought marriage counseling in order to improve her marriage to Appellant; and CW's work with her horses caused bruising on her body. The Defense concluded its motion by requesting the military judge (1) "[o]rder the Government to produce any and all known mental health records, medical records, prescription records,

family advocacy records and marriage counseling records of [CW]; (2) "[o]rder an in camera review of those records to determine whether or not some or all of them should be released because it is constitutionally required;" and (3) "[r]elease to the Defense those records deemed relevant."

The Defense's motion to compel was addressed by the military judge and the parties at trial after pleas.[2]  The Government did not file a response and agreed with the Defense that an in camera review of all of the records was appropriate.  The Government confirmed that no member of the trial team had reviewed any of the requested records and that CW consented to the military judge's in camera review.  No additional evidence or argument was presented to the military judge,[3] who agreed to conduct the in camera review.

The next morning, the military judge stated that he reviewed CW's medical and mental health records.  He announced that he considered Appellant's constitutional confrontation rights under the Sixth Amendment, explaining that "[i]nformation contained in . . . mental health or medical records becomes constitutionally required *inter alia* when the information contradicts a person's testimony or contains evidence of malfeasance towards the accused for a reason to fabricate or as a witness testifies through the discovery of prior inconsistent statements."  The military judge verbally informed the parties that his *in camera* review of the medical and mental health records provided by the Government revealed "no such evidence exist[ed] in the records at [that] time."  Even after being provided most of the records by the Government[4] and conducting his in camera review, the military judge acknowledged, based on the trial counsel's assurance, "that the Government is not in possession of these records[.]"  The military judge assured the parties that he would release "such records at the time that the records become relevant[.]"  The military judge issued a written ruling substantially reiterating his previous findings and analysis.[5]

At trial, CW testified about her relationship with Appellant and being assaulted as alleged in the specifications.  With respect to the November 2012 allegation, CW testified that she threatened and physically confronted Appellant in the shower and that Appellant responded by punching her several times.  CW maintained Appellant continued to kick her while she was on the ground.  Approximately 11 days later, CW photographed the injuries she sustained during this assault after a friend noticed the bruising and convinced her to do so.

---

[2] Prior to trial, the Government obtained sealed copies of CW's medical records, family advocacy records, and portions of CW's civilian mental health records.  On 11 November 2014, the military judge ordered production of Appellant's and CW's civilian marriage counseling records.  These civilian marriage counseling records were produced and marked as Appellate Exhibit III-D.

[3] The Defense enjoyed the expert assistance of a forensic psychologist.

[4] All of the records, except those ordered to be produced by the military judge in Appellate Exhibit III-D, were obtained by the Government in advance of trial.

[5] The military judge's written ruling, Appellate Exhibit VII, although dated 13 November 2014, was "ordered" on 18 November 2014 and provided to the court reporter after trial.

CW discovered Appellant's relationship with CR in March 2014 after seeing a photograph of CR on Appellant's phone. CW testified that Appellant finally admitted to his relationship with CR and eventually gave CW permission to call CR on Appellant's phone. CW recounted Appellant forcibly trying to take the phone back from her. She described Appellant grabbing her and slamming her into the toilet and wall. CW added that Appellant shoved her onto the floor after she gave Appellant his phone. She explained that Appellant left the home to talk to his commander and that she eventually followed him to the squadron. CW detailed her meeting with Appellant's commander, including how she showed the commander her injuries. She also identified the photographs investigators took of those injuries.

Before cross-examining CW, the Defense consulted with its expert in forensic psychology. During cross-examination, defense counsel presented evidence regarding CW's work with horses and the risks associated with such work. Defense counsel confronted CW with her Article 32 testimony; her failure to seek proper medical attention; her failure to report any of her allegations before March 2014; her actions towards Appellant before, during, and after the allegations; her suicidal threats and altercation the night before the March 2014 assault; her biases; and her motives to fabricate or minimize her role in the altercations.

Prior to the Government's redirect examination of CW, defense counsel asked if the military judge would reconsider his decision not to disclose material from CW's medical and mental health records. The military judge stated that he would review the records and compare them with his trial notes. After completion of CW's testimony, the military judge once again reviewed the records over a recess and released three redacted pages from CW's Family Advocacy records to the parties under a protective order. The military judge noted that "this is an ongoing process and the court may release further documents as it deems required to do so constitutionally."

In addition to the testimony of CW, the Government presented the photographs documenting the injuries CW claimed she sustained as a result of the November 2012 and March 2014 assaults; testimony of witnesses who observed the injuries near the time of the November 2012 and March 2014 assaults; CW's prior consistent statements describing the November 2012 assault; a letter written by Appellant to CW on 30 April 2014, in which Appellant apologized, in general terms, for hurting CW and causing her pain; and Appellant's admission to his commander that he had hit CW once in self-defense.

Through cross-examination of Government witnesses, defense counsel presented substantial evidence regarding CW's work with horses, the physical risk involved with such work, as well as injuries CW sustained while working with her horses. Defense counsel also elicited evidence that following the November 2012 assault, CW sent Appellant's commander a text message that stated, "We are safe."

In its case, the Defense presented evidence of Appellant's character for peacefulness, as well as CW's character for aggressiveness. The Defense offered testimony describing CW's use of alcohol and medication during the March 2014 assault. Appellant also testified. After generally denying assaulting CW, Appellant addressed each of the five assault allegations.

With respect to the November 2012 assault in the bathroom, Appellant corroborated portions of CW's testimony but described CW as the aggressor. Appellant claimed that he "ended up" in a "sort of grapple" after CW kneed him in the groin. Appellant described grabbing CW to keep her from hitting him. Appellant explained that CW tripped and fell but continued to hit and kick him. Appellant admitted to punching CW with a closed fist approximately three times in order to get her to stop hitting and kicking him.

Like the November 2012 assault, Appellant's testimony regarding the March 2014 assault corroborated much of CW's testimony; however, Appellant described another "grapple" ensuing during which CW stumbled, fell, and hit her knee on the toilet while Appellant tried to retrieve his phone. Appellant admitted that he was "agitated" and "afraid" after giving his phone to CW, but he denied shoving or pushing CW.

During his testimony, Appellant described CW's behavior when she would drink and take her medication. Appellant provided substantial testimony about the physical risks to which CW was exposed while caring for horses and the injuries CW had sustained, or could sustain, while performing such work.

Trial counsel asked the military judge to again review CW's records before the Government cross-examined Appellant.[6] During cross-examination, Appellant confirmed that he punched CW with a closed fist three times in November 2012. Appellant also confirmed that a bruise depicted in one of the Prosecution Exhibit 1 photographs resulted from the November 2012 incident. Appellant confirmed he was agitated when CW had his phone in March 2014. Appellant also acknowledged that CW did not threaten him or attempt to hit or strike him in any way before he followed her to retrieve his phone. Appellant repeated his observations of CW when she drank while on her medication. He also recounted her alcohol consumption and suicidal gesture the night prior to the March 2014 assault.

In their testimony, CW and Appellant both acknowledged that they attended joint counseling sessions. The records confirmed Appellant's participation in some Family Advocacy and civilian marriage counseling sessions. The evidence also presented CW's and Appellant's expressed desires to separate, leave, or divorce at different times throughout the marriage.

---

[6] The military judge did not release additional portions of the records.

In its argument, the Defense attacked the credibility of CW, highlighting the various methods of impeachment used to confront CW. The Defense identified what it termed a "pattern of abuse" by CW towards Appellant and argued Appellant acted reasonably in self-defense under the circumstances, or, with respect to the March 2014 assault, was engaged in a "mutual scuffle." Defense counsel also argued that a real possibility existed that the injuries depicted in the photographs were caused by CW's horses, not Appellant. Defense counsel invited the military judge to weigh the credibility of CW and Appellant, emphasizing Appellant's willingness to admit to having sexual intercourse with CR, sending the sexually explicit material, and hitting CW once.

CW did not testify during sentencing proceedings. No other requests for disclosure of the records were made.

Appellant now argues that the Government should have disclosed portions of CW's medical records "where she reported feeling safe at home and unthreatened in her personal relationship, along with records indicating inconsistent statements, motives to fabricate, bias, and information concerning her mental health and prescriptions that could [a]ffect her memory and recollection."

Article 46, UCMJ, 10 U.S.C. § 846(a), provides that "[t]he counsel for the Government, the counsel for the accused, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the President may prescribe." This statutory provision "is implemented in [Rule for Courts-Martial (R.C.M.)] 701 which details the liberal discovery practice in courts-martial." *United States v. Roberts*, 59 M.J. 323, 325 (C.A.A.F. 2004). R.C.M. 701 establishes "the rights and corresponding obligations of the parties to a court-martial." *Id.*

R.C.M. 701(a)(2)(A) requires the Government, upon defense request, to allow inspection of any tangible objects, such as papers and documents, that "are within the possession, custody, or control of military authorities, and which are material to the preparation of the defense . . . ." Likewise, R.C.M. 701(a)(2)(B) entitles the Defense, upon request, to inspect the following:

> [a]ny results or reports of physical or mental examinations . . . which are within the possession, custody, or control of military authorities, the existence of which is known or by the exercise of due diligence may become known to the trial counsel, and which are material to the preparation of the defense . . . .

Regardless of whether trial defense counsel has made a request, trial counsel is required to disclose known evidence that "reasonably tends to" negate or reduce the degree of guilt of the accused or reduce the punishment that the accused may receive if convicted. *See* R.C.M. 701(a)(6); *see also United States v. Williams*, 50 M.J. 436, 440 (C.A.A.F. 1999)

(noting that R.C.M. 701(a)(6) implements the disclosure requirements of *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Evidence that could be used at trial to impeach witnesses is subject to discovery under these provisions.[7] *See United States v. Watson*, 31 M.J. 49, 54 (C.M.A. 1990) (citing *Giglio v. United States*, 405 U.S. 150 (1972)).

Discovery practice under Article 46, UCMJ, and R.C.M. 701 is intended to "promote full discovery . . . and to eliminate 'gamesmanship' from the discovery process" and is "quite liberal . . . . [p]roviding broad discovery at an early stage reduces pretrial motions practice and surprise and delay at trial." *Manual for Courts-Martial*, *United States*, app. 21 at A21-33 (2012 ed.). "The military rules pertaining to discovery focus on equal access to evidence to aid the preparation of the defense and enhance the orderly administration of military justice." *Roberts*, 59 M.J. at 325. Therefore, military discovery practice is not focused solely upon evidence known to be admissible at trial. *See United States v. Stone*, 40 M.J. 420, 422 (C.M.A. 1994) (citing *United States v. Lloyd*, 992 F.2d 348, 351 (D.C. Cir. 1993)). "The parties to a court-martial should evaluate pretrial discovery and disclosure issues in light of this liberal mandate." *Roberts*, 59 M.J. at 325.

R.C.M. 703 governs the production of witnesses and evidence. This rule gives the prosecution and the defense "equal opportunity to obtain witnesses and evidence, including the benefit of compulsory process." R.C.M. 703(a). In general, "each party is entitled to the production of evidence which is relevant and necessary." R.C.M. 703(f).

However, pursuant to Mil. R. Evid. 513 and R.C.M. 701(f), the confidential communications between a patient and psychotherapist are generally protected from disclosure. Several enumerated exceptions to this privilege exist, but only Mil. R. Evid. 513(d)(8), which authorized disclosure when "constitutionally required," applies to the present case.[8]

If the Government fails to disclose discoverable evidence, the error is tested on appeal for prejudice, which is assessed "in light of the evidence in the entire record." *United States v. Stone*, 40 M.J. 420, 423 (C.M.A. 1994)). As a general matter, when an appellant has demonstrated error with respect to nondisclosure, the appellant will be entitled to relief only if there is a reasonable probability that there would have been a different result at trial if the evidence had been disclosed. *Roberts*, 59 M.J. at 326-27 (citing *United States v. Bagley*, 473 U.S. 667, 683 (1985)). When an appellant has demonstrated that the Government failed to disclose discoverable evidence with respect to a specific

---

[7] In *United States v. Bagley*, 473 U.S. 667 (1985), the Supreme Court "rejected any . . . distinction between impeachment evidence and exculpatory evidence." In accordance with *Bagley*, our superior court specifically held that "impeachment evidence . . . can obviously be material evidence at a criminal trial." *United States v. Watson*, 31 M.J. 49, 54-55 (C.A.A.F. 1990). Impeachment "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 54 (quoting *Bagley*, 473 U.S. at 682).

[8] In 2015, Mil. R. Evid. 513 was amended, eliminating the "constitutionally required" exception.

request or as a result of prosecutorial misconduct, the appellant will be entitled to relief unless the Government can show that nondisclosure was harmless beyond a reasonable doubt. *See id*. at 327.

R.C.M. 701(g) places responsibility for regulating discovery on the military judge. We review a military judge's ruling on a discovery request for abuse of discretion. *Roberts*, 59 M.J. at 326. "The military judge's determination of materiality in this respect is a question of law that we review de novo." *Id.*

The issue raised in this case illustrates an all too common problem at the trial level in which the parties and the military judge cloud the rules and standards governing discovery, production, and privilege.[9] However, we need not decide whether the military judge abused his discretion under the particular facts of this case. *See United States v. Morris*, 52 M.J. 193, 198 (C.A.A.F. 1999).

Under the standards set forth in *Roberts* and the cases cited therein, we may resolve a discovery issue without determining whether there has been a discovery violation if the court concludes that the alleged error would not have been prejudicial. *United States v. Santos*, 59 M.J. 317, 321 (C.A.A.F. 2004). Accordingly, we assume without deciding: (1) that the information identified by Appellant and contained within the records was material to the preparation of the defense and should have been disclosed in response to the discovery requests; and (2) that failure to do so should be tested for prejudice on appeal under the harmless beyond a reasonable doubt standard. *See id.*

With respect to the two assault convictions at issue in this case, the Government presented evidence to corroborate CW's mostly consistent testimony regarding the November 2012 and March 2014 assaults. For example, the military judge, as the factfinder, was able to consider photographs and other testimony that supported CW's assertions at trial. Importantly, Appellant provided compelling evidence of his guilt to these two specifications. He testified that he punched CW with a closed fist at least three times and acknowledged CW was left with marks on her body as a result of that incident. Appellant also testified to being agitated with CW and "grappling" with her in order to retrieve his phone, even though she had not threatened him in any manner. Such evidence undermined the Defense's theory of self-defense as applied to these two specifications.

Moreover, information within the undisclosed records pertaining to CW's drinking, medication use, failure to report abuse, feelings of safety, suicidal thoughts, and exposure to injuries likely caused by horses is largely cumulative of other information already available to Appellant at trial. In view of Appellant's knowledge of CW based upon his relationship with her, as reflected in his testimony at trial, as well as his presentation of this

---

[9] *See* Eric Carpenter, *Simplifying Discovery and Production: Using Easy Frameworks to Evaluate the 2009 Term of Cases*, 2011 Army Law. 31 (emphasizing a "simple but critical point in discovery analysis: precision matters").

information to the factfinder through cross-examination and other evidence, the additional value of such information was minimal. *See Santos,* 59 M.J. at 322.

That CW may have provided inconsistent statements, harbored some bias towards Appellant, or may have been motivated to fabricate the allegations or minimize her role in the assaults, was already known to the Defense at trial, as reflected in its presentation of evidence, including Appellant's own testimony. Defense counsel confronted CW and effectively impeached her testimony at trial. The military judge, as factfinder, was well aware of the matters impacting CW's credibility. The military judge ostensibly weighed Appellant's and CW's credibility when finding Appellant not guilty of the other three assault specifications.[10] Additional, marginally relevant impeachment evidence "would not have had a significant impact on the military judge's adjudication of the findings." *See id.*

"The review of discovery violations involves case-specific considerations." *Id.* In another case, undisclosed information "that cast[s] doubt on the credibility of a witness might have greater value." *See id.* In this case, however, in light of the minimal additional probative value and utility of the specific, undisclosed information identified by Appellant, and in light of all the evidence presented in the record, we are satisfied that the nondisclosure was harmless beyond a reasonable doubt. *See id.*

*Conclusion*

The findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

LEAH M. CALAHAN
Clerk of the Court

---

[10] *See* Appellant's 5 February 2015 Petition for Clemency ("When taken as a whole, it is clear [CW] is not the most credible person. This is clearly illustrated by the military judge's findings of not guilty on three of the five assault specifications against Capt Moore.").